James Leslie KARIS, Petitioner–
Appellee,

v.

Arthur CALDERON, Warden,
Respondent–Appellant.

James Leslie Karis, Petitioner–
Appellant,

v.

Arthur Calderon, Warden,
Respondent–Appellee.

Nos. 98–99025, 98–99026.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 16, 1999.

Filed March 18, 2002.

Norman C. Hile, Sacramento, CA, for the petitioner.

Paul E. O'Connor, Deputy Attorney General, Sacramento, CA, for the respondent.

Before HUG, BROWNING and KLEINFELD, Circuit Judges.

Opinion by Judge HUG; Partial Concurrence and Partial Dissent by Judge KLEINFELD

HUG, Circuit Judge:

The Warden of the California State Prison, San Quentin, appeals the district court's order granting in part the 28 U.S.C. § 2254 habeas corpus petition of James Karis, who was convicted in 1982 of first degree murder with special circumstances, attempted murder, kidnaping, and rape. The district court granted the petition as to the penalty phase of the trial based on counsel's failure to investigate and present evidence of child abuse and family violence. Karis cross-appeals the

denial of the remainder of the petition. We conclude that the district court properly denied Karis' claims with regard to the conviction of murder. We further agree with the district court that counsel provided Karis constitutionally ineffective assistance at the penalty phase. Accordingly, we AFFIRM.

### FACTS

The evidence produced at the state court trial presented the following facts. On July 8, 1981, Ms. P and Ms. V were taking a brief walk during their midmorning break from their jobs in Placerville, California. At approximately 10:30 a.m., as they were walking under an overpass, a man ordered the women at gunpoint to enter his car. They entered the back seat and the man drove some distance out of town, drove off the road, stopped the car, and ordered the women to walk down a dirt path to a creek bed. They followed the creek bed to an area where the man ordered the women to disrobe.

Ms. P was gagged and her hands tied and Ms. V was raped. The man then ordered the women to continue walking down the creek bed. When they reached a large hole, the man ordered both women to get into the hole. In reply to Ms. V's plea that she not be killed, the man stated that he had to kill them so that he would not be killed. The women turned away from the man and Ms. V heard five shots. She felt a numbness in her neck after the second shot and felt the impact of a second bullet in her neck with the fourth shot. She feigned death and heard the man throwing rocks on her and Ms. P.

After hearing him leave, Ms. V waited several minutes before making her way out to the road where she flagged down a truck driver who then flagged down a car on the highway to take Ms. V to Chili Bar where the sheriff and medical help were summoned. Ms. V described Ms. P's location to the truck driver who remained near the highway to guide emergency personnel. Shortly thereafter, a paramedic examined Ms. P and determined that she was dead. The cause of death was one of three bullet wounds and a fracture through the base of her skull.

The truck driver testified that Ms. V described her assailant as a man with long dark hair and a green car. According to an officer at Chili Bar, Ms. V described her assailant as "a male Mexican, 5'8" to 5'10", heavy build, with a moustache and at least a one-day-old beard." She also told him that her assailant drove a "ratty old big car, green in color, two-door." The officer who accompanied her in the ambulance from Chili Bar to the local hospital testified that she described her assailant "as having dark, shoulder-length hair, medium-dark moustache, five foot eight to ten inches tall, wearing a white T-shirt, blue jeans, and possibly of Mexican descent." The officer who interviewed Ms. V in the hospital emergency room testified that she gave a similar description of her assailant and his car.

Ms. V testified that one or two days after the shooting she told a police detective that her assailant "was a little taller than I was, around five ten, and that he had shoulder length hair, maybe a little bit longer, and that it was dark hair, black hair, and it was curly or wavy, and that he had a moustache that was like a Fu Manchu style, and he hadn't shaved for a couple of days." She also testified that on that same occasion she stated that she didn't know his nationality, but it could be Mexican, Indian or Italian—that he had dark skin and dark hair.

Analysis of a stain on Ms. V's underwear indicated the presence of seminal fluid. The stain was also tested for phosphoglucomutase (PGM) enzyme type and for blood type. At trial, an expert called by

the prosecution testified that PGM was a genetic marker found in body fluids and that the PGM enzyme type of the seminal fluid was the same as Karis'. The same expert also testified that Karis was a non-secretor and so, his AB blood type would not show up in other body fluids such as semen or saliva and that only Ms. V's blood type was found in the stain. This expert further testified that 4% of the population were non-secretors with Karis' PGM type. On cross-examination the expert did acknowledge that approximately one out of four persons in the population could have been the source of the seminal fluid. Ms. V's husband, however, was ruled out as a source of the fluid.

Ms. V had initially described the car in which she had been abducted as an old, large green two-door car of American make. At trial, she testified that the car was an older, large, two door car, which was two-tone and light green with a dark interior and a vinyl top. Detective Southern testified that on July 8, Ms. V also told officers about objects in the car. At trial, she testified that she had seen a black cool cushion and two rectangular pillows, one a dark color and the other a bright color. On July 9, officers impounded Karis' car and removed three pillows from the back seat. On July 10, Ms. V was shown the pillows and stated that they looked like the ones she had seen in the car.

Karis' neighbor David Marden testified that, on the afternoon that was determined to be July 8, 1981, he saw Karis driving up to the house much faster than he had ever seen him drive before. On the evening of July 8, Karis' brother Kevin Jones and Kevin's girlfriend, Dana Skelton, drove to the house that Karis shared with his mother and Kevin. Dana testified that after Kevin stopped to speak to a deputy sheriff parked at the foot of the driveway, he drove up to the house and spoke to his mother. He returned to the car and told Dana that he had to take her home and that they had to take Karis with them in the trunk of the car because Karis was dealing in cocaine. After they left the house with Karis hidden in the trunk, Karis joined Dana and Kevin in the passenger compartment of the car. Dana testified that Karis had a moustache and a little bit of a beard at that time. They drove to Dana's grandmother's home where they spent the night. The next morning, July 9, Kevin promised Dana that he would drive her to work but later told her that he could not because Karis had to leave. Ten minutes later, the two men left. Dana's grandmother described the man who had stayed at her home as having a fairly long moustache and dark hair. She identified a photograph of Karis.

Around noon on that day, July 9, Karis arrived at the home of friends Peggy Steuben and Jay Raugust in Rancho Cordova. Steuben testified that Karis was quiet, withdrawn, and clean shaven. Karis asked if he could stay with them a couple of days and Steuben refused. Karis left around 7:30 that evening. Steuben also testified that Karis earlier had visited Rancho Cordova on July 4, 1981. During that visit she and Karis talked about keeping a gun for self-defense. Karis told her "[t]hat because of where he had been, in prison, that, you know he would never want to go back there again and it was self-defense to not leave a—you know, to eliminate anybody that could send him back there." During the discussion Steuben commented that it would be a particularly horrible thing to kill a rape victim and Karis responded "[t]hat he—leaving any witness to testify, that—that he had committed any certain crime or anybody else had committed any certain crime would be sending him back to prison, and it would be necessary to not leave a witness."

Prior to trial, Kevin Jones suffered a stroke. By stipulation that he was mentally and physically incompetent to testify, portions of his preliminary hearing testimony were read to the jury. Parts of Kevin's testimony differed significantly from trial testimony of Karis and Dana Skelton. Kevin testified that on the morning of July 8, 1981, the day of the murder, he, Karis and their mother went to Placerville to cash a check at the Lucky Market, and then went to the post office to buy a money order. Kevin stated that they drove back to their home between 9:30 and 10:00 that morning and that he and Karis remained at home the entire day except for checking the mail and going out for a beer. Kevin also stated that Karis had shaved his moustache off a week before. Kevin claimed to have spent the night of July 8 with Dana Skelton, arrived home the next morning around 8:00 a.m., and driven Karis to the bus station around 9:00 a.m.

Kevin was interviewed several times before trial and officers testified that Kevin made contradictory statements. On the night of July 9, 1981, he told an officer that when he woke at 10:00 a.m. on July 8, the day of the murder, the car was gone. He also told officers that Karis had a moustache on the morning of July 8, but shaved it off the following morning telling Kevin to tell anyone who asked that he had shaved it off a week earlier.

Karis testified that on July 8, 1981, he arose at 7:30 a.m., shaved, and drove alone to Placerville where he cashed his unemployment check at the supermarket and purchased a money order which he mailed to his landlord. He claimed to have returned home by 10:15 a.m. where he remained until 1:30 p.m. when he and Kevin drove to Georgetown Springs where they drank beer and returned home around 3:30 p.m. Karis testified that Kevin left in the family car at about 6:30 p.m. and returned later that evening, driving Karis away hidden in the trunk because of the patrol car on the property which Karis assumed was there because of marijuana he was cultivating.

Karis claimed that he returned home on July 9 and then decided to leave and visit some friends until he could find out what was happening. Kevin drove Karis to the bus station and from there Karis walked to an on-ramp to Highway 50 and hitched a ride to Steuben's house. When Kevin informed him that the police were looking for him he shaved his moustache, trimmed his sideburns, cut his hair and spent the next several days sleeping along the American River.

On July 15, 1981, Karis kidnaped two women and the five-month-old son of one of them in Sonoma County. The women had been playing tennis at a Fairfax park and when they returned to their van, Karis ordered them inside at knife point and forced the owner of the van to drive northward. The women testified that he told them that he was a murderer, wanted for murder and had nothing to lose. The owner of the van testified that she heard Karis tell the other woman to remove her clothes but when the van owner said that she could not drive safely if nervous and asked Karis to return to the front seat, he did so. She further testified that he told her that he would not hurt them if they cooperated, meaning that he would not break any bones or kill them, "but rape they could live with." The other woman in the van also testified about this incident. The van owner testified about attempting escape from the van when Karis stopped to make a phone call at a service station, where she managed to attract a gas station attendant's attention before Karis grabbed her hair, flung her to the floor, and told her he was going to kill her.

Karis fled from the gas station to a mobile home park where he forced his way into a mobile home. The mobile home occupant testified that Karis pressed a knife to her stomach and demanded her car keys. It was there that Karis was apprehended.

On July 15, 1982, a Sacramento County jury convicted Karis of: (a) the first degree murder of Ms. P, with special circumstances of murder in the commission of kidnaping and in the immediate flight from rape, (b) the attempted murder of Ms. V, (c) the kidnaping of Ms. P and Ms. V, and (d) the rape of Ms. V. He was found to have personally used a firearm in the commission of each offense and to have intentionally inflicted great bodily injury in the commission of the attempted murder and kidnaping offenses.

Following a penalty trial, the jury returned a verdict of death. On September 17, 1982, the trial court imposed a judgment of death and sentenced Karis to an aggregate term of 41 years for the other offenses and enhancement allegations.

In 1986, Karis filed a direct appeal from the conviction and a single issue petition for a writ of habeas corpus, challenging trial counsel's failure to attempt to exclude the testimony of Karis' brother and of a police officer. In *People v. Karis*, 46 Cal.3d 612, 250 Cal.Rptr. 659, 758 P.2d 1189 (1988), *cert. denied*, 490 U.S. 1012, 109 S.Ct. 1658, 104 L.Ed.2d 172 (1989), without holding an evidentiary hearing, the California Supreme Court affirmed the judgment and denied the petition.

Karis' appellate counsel withdrew from the case after the United States Supreme Court denied a petition for a writ of certiorari. In 1989, Karis filed an application for appointment of counsel in federal district court. Counsel was appointed in May of that year and on March 26, 1990, Karis filed a petition containing a number of unexhausted claims and, after some discovery, he amended it to add further claims.

On September 4, 1990, with Karis and counsel for both parties present, the court held a hearing to determine whether there were any claims not identified in the amended petition. Later that month, the parties agreed upon the identity of all unexhausted claims and those proceedings were stayed pending exhaustion of state remedies. Karis filed a second state habeas corpus petition in July 1991 and the California Supreme Court ordered informal briefing. The State argued that Karis had failed to explain the delay in raising these claims.

Karis filed an amended petition which included a brief explanation of the proceedings in the district court and an additional claim not contained in the July petition. Without explanation, the California Supreme Court treated this amended petition as a new one and the State did not file an opposition to the amended petition. In October 1991, in a nine-paragraph minute order, the California Supreme Court denied the July petition. The court denied the amended petition in a two-line order in February 1992.

In March 1992, after Karis informed the district court that he had exhausted his state remedies, the court reopened the case. Karis filed a second amended petition on April 3, 1992. This is the final petition in this action.

The district court affirmed the recommendation of the Magistrate Judge to deny the State's motion to dismiss procedurally defaulted claims. The Magistrate Judge granted in part Karis' motion for an evidentiary hearing. That hearing commenced on February 1, 1995. The Magistrate Judge took evidence in court through the end of February and, with the parties' consent, received other testimony in the form of depositions. The parties submit-

ted final briefs on the merits of all claims and on May 29, 1997, the Magistrate Judge issued his Findings and Recommendations. The Magistrate Judge recommended that Karis' petition be granted as to the penalty phase of the trial on the basis of trial counsel's failure to investigate and present evidence of child abuse and family violence, but that it be denied on all other claims.

Both parties filed timely objections to these Findings and Recommendations and both replied to the other's objections. The district court heard oral argument on the parties' objections and the parties submitted additional briefs. On August 3, 1998, the district court adopted the Findings and Recommendations of the Magistrate Judge and entered the final judgment.

### *JURISDICTION*

The district court had jurisdiction over Karis' petition pursuant to 28 U.S.C. § 2254. The State filed a timely notice of appeal on August 25, 1998, from the August 3, 1998 judgment, as did Karis on August 26, 1998. On August 31, 1998, the district court granted the State's motion to stay its judgment pending finality of the parties' appeals to this Court and Karis' application for a certificate of probable cause.

■ The provisions of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–122, 100 Stat. 1214 ("AEDPA") regarding the issuance of a certificate of appealability ("COA") as a predicate to review in the court of appeals apply to all cases in which the notice of appeal was filed after AEDPA's effective date, regardless of whether a certificate of

probable cause has already been issued. *See Slack v. McDaniel,* 529 U.S. 473, 482–83, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000). Karis' appeal falls within this category of cases. Therefore, consistent with *Slack,* we treat Karis' notice of appeal in this case as an application for a COA. *See id.; Schell v. Witek,* 218 F.3d 1017, 1021 n. 4 (9th Cir.2000) (en banc). We conclude that Karis has made the requisite "substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and we grant the COA and exercise jurisdiction over these issues pursuant to 28 U.S.C. § 2253 and Rule 22 of the Federal Rules of Appellate Procedure.[1]

### *STANDARD OF REVIEW*

■ We review de novo a district court's denial of a petition for habeas corpus. *See Bean v. Calderon,* 163 F.3d 1073, 1077 (9th Cir.1998). "However, findings of fact made by the district court relevant to the denial of [petitioner's] habeas corpus petitions are reviewed for clear error." *Bonin v. Calderon,* 59 F.3d 815, 823 (9th Cir.1995).

### *DISCUSSION*

### *I. Guilt Phase Claims*

■ We review the district court's decision not to conduct an evidentiary hearing in a habeas proceeding for abuse of discretion. *Swan v. Peterson,* 6 F.3d 1373, 1384 (9th Cir.1993). A habeas petitioner must meet two conditions to be entitled to a federal evidentiary hearing: (1) allege facts which, if proven, would entitle him to relief, and (2) show that he did not receive a full and fair hearing in a state court,

---

1. We note, however, that even though the provisions of the AEDPA apply to the issue of whether Karis is entitled to a certificate of appealability, pre-AEDPA law applies to the merits of the habeas petition because Karis filed his petition in district court before the

effective date of the AEDPA. *See Slack v. McDaniel,* 529 U.S. 473, 479, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000); *Lindh v. Murphy,* 521 U.S. 320, 326, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); *Bean v. Calderon,* 163 F.3d 1073, 1077 (9th Cir.1998).

either at the time of the trial or in a collateral proceeding. *See Hendricks v. Vasquez,* 974 F.2d 1099, 1103 (9th Cir. 1992).

█ Here, the district court correctly found that substantial unchallenged evidence of guilt exists. We agree that even if the facts Karis alleges are proven, Karis would still not be entitled to relief on his guilt phase claims and, thus, the district court did not abuse its discretion in denying Karis an evidentiary hearing for these claims. *See id.* Karis relies on our precedent that in a capital case, a habeas petitioner who asserts a colorable claim to relief, and who has never been given the opportunity to develop a factual record on that claim, is entitled to an evidentiary hearing in federal court. *See Siripongs v. Calderon,* 35 F.3d 1308, 1310 (9th Cir. 1994). Notwithstanding that language, Karis' claim fails because even assuming his allegations to be true, they do not entitle him to habeas relief. *Hendricks,* 974 F.2d at 1103.

## A. Prosecutorial Misconduct

█ Karis contends that the prosecutor committed misconduct by preventing defense counsel from interviewing Peggy Steuben and by manipulating her testimony. Steuben testified that on July 4, 1981, she had a conversation with Karis and he told her that he would eliminate anyone who could send him back to prison. Steuben now seeks to clarify the context of the conversation and that Karis only casually made general comments to that effect. Steuben's most recent account is that Karis said that "as an ex con he wouldn't be treated fairly and he could understand how he or someone like him could kill the victim of a crime to stay out of prison as a matter of self defense."

Even taking Steuben's most recent statements as true, they have minimal if any effect on the case as she did not recant her testimony, rather merely put her comments of the conversation in a slightly different context. Additionally, as described above, there was sufficient evidence without Steuben's declaration to identify Karis as the killer and to show premeditation. A surviving victim gave numerous consistent descriptions of Karis as well as a positive identification of him and of pillows found in his car that she recognized from the car in which she was abducted. The evidence showed that he forced the victims into his car at gunpoint, drove to a remote location, raped one, and then walked them at gunpoint to a large hole where he forced them to kneel while he shot them.

Even assuming Karis' allegations to be true, we are precluded from granting Karis' request for relief on the basis of the mere presence of prosecutorial misconduct without any concomitant prejudice. *Thomas v. Cardwell,* 626 F.2d 1375, 1382 (9th Cir.1980). Even if Karis could establish that Steuben's testimony at trial was manipulated, to be entitled to relief on that ground he would also need to show a "reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Young,* 17 F.3d 1201, 1203 (9th Cir.1994) (quoting *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)). We agree with the district court's finding that given the extent and weight of the other identification and premeditation evidence there is no reasonable likelihood that Steuben's testimony affected the guilty verdict.[2]

Karis further alleges that Russell Herman, the prosecutor's investigator intimi-

**2.** Because we affirm the district court's decision to grant Karis' petition for ineffective assistance of counsel in the penalty phase, we do not reach Karis' claim with regard to the prosecutor's having mentioned Steuben's testimony during the penalty phase.

dated Steuben to manipulate her testimony by falsely telling her that (1) Karis was a member of the Aryan Brotherhood whose associates would kill her at Karis' orders; and (2) that he would influence favorably her pending child custody battle if she was willing to testify. Steuben now asserts that Herman told her not to talk to the defense. Herman testified that Steuben told him Karis was an Aryan Brotherhood member and that when Steuben told him she did not want to talk to Karis' attorney, Herman told her she did not have to talk with anyone if she did not want to.

■ Karis further alleges that Herman's failure to disclose that he had a number of interviews with Steuben, that he felt that Steuben was under the influence of drugs during some of the interviews and that her story changed frequently among interviews constituted prosecutorial misconduct. To prevail under a claim that the government withheld exculpatory evidence, Karis must establish that the any such evidence withheld was material. Evidence is material if there is " 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Paradis v. Arave*, 240 F.3d 1169, 1176 (9th Cir.2001) (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). A "reasonable probability" is a probability

"sufficient to undermine confidence in the outcome." *Id.*[3]

We need not decide whether any alleged prosecutorial misconduct did occur, because even assuming Karis' allegations are true, Karis is not entitled to relief based on these claims. As described above and as the district court found, there was substantial evidence implicating Karis at the guilt phase. Karis' allegations of prosecutorial misconduct present neither structural error nor a "deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct" which might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 638 n. 9, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).[4]

Thus, it is clear that Karis is not entitled to habeas relief based on this alleged error unless he can establish that it resulted in "actual prejudice." *Id.* at 637, 113 S.Ct. 1710. Karis' alleged errors warrant a grant of habeas relief only if, in light of the record as a whole, the alleged error "had substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 638, 113 S.Ct. 1710; *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir.1997) (prosecutorial misconduct subject to harmless error); *Bentley v. Scully*, 41 F.3d 818, 822 (2d Cir.1994) (applying *Brecht* harmless error test to claim of prosecutorial

---

3. In *Paradis* we held that evidence is material if it could have been used to impeach a key prosecution witness sufficiently to undermine confidence in the verdict. *Id.* at 1179. As discussed below, Steuben's testimony does not meet this standard because even excluding her testimony altogether, sufficient evidence remained to allow confidence in the guilty verdict.

4. Karis' argument that *Chapman* review for error "harmless beyond a reasonable doubt"

is required where no such analysis was conducted in state court review, is foreclosed by our decision in *Bains v. Cambra*, 204 F.3d 964, 977 (9th Cir.2000). In *Bains*, a panel of this Court held that the *Brecht* standard applies to all § 2254 cases, regardless of the type of harmless error review conducted by the state courts. We therefore reject Karis' invitation to perform a *Chapman* analysis. Moreover, the district court found these alleged errors harmless beyond a reasonable doubt under *Chapman*.

misconduct). We think it clear that, even taking Karis' allegations as true, he cannot make this required showing.

## B. Improper Presentation of Testimony

■■■■ Karis alleges that if Steuben had testified truthfully, her testimony would have been excluded as irrelevant because his statements to Steuben did not refer to the crime for which he was tried. The California Supreme Court concluded that Steuben's testimony was admissible as evidence of Karis' state of mind. *People v. Karis*, 46 Cal.3d 612, 636–37, 250 Cal.Rptr. 659, 758 P.2d 1189 (1988). Karis maintains that absent prosecutorial misconduct, Steuben's testimony that Karis made general statements would not have satisfied the state-of-mind exception to the hearsay rule. He further claims that this allegedly improper presentation of testimony to the jury violated due process.[5] Again, even if we assume the truth of this claim of prosecutorial misconduct, Karis' failure to establish prejudice precludes us from granting him relief on this basis. Even assuming the alleged misconduct did occur, such error under the circumstances here is harmless and, thus, cannot warrant habeas relief. *Id.*

■■■■ Finally, Karis argues that he has alleged such an egregious pattern of prosecutorial misconduct that it cannot be deemed harmless error. In the "unusual case" such error might be "deliberate and especially egregious" or so "combined with a pattern of prosecutorial misconduct" as to "infect the integrity of the proceeding[s]." *Brecht*, 507 U.S. at 638 n. 9, 113 S.Ct. 1710. In making this determination, we must consider whether a combination of misconduct and error so infected the entire proceeding as to destroy its fairness. *Hardnett v. Marshall*, 25 F.3d 875, 879 (9th Cir.1994). As discussed above, in light of the substantial evidence even without this disputed testimony of identification and premeditation Karis does not present such a case and, thus, we cannot grant his requested habeas petition on this ground.

## C. Juror Misconduct

Karis alleges that, sometime after the testimony of Dr. Loftus, his identification expert, a juror asked a librarian at the public library whether it carried any books authored by Dr. Loftus. The juror later reported to other jurors that the library did not have any such books. The district court found that this conduct occurred during the penalty phase. Based on the evidence presented to the district court, we conclude that this finding was not clearly erroneous. Because we agree with the district court that Karis is entitled to habeas relief for the penalty phase based on constitutionally ineffective assistance of counsel, we do not address the issue of potential prejudice this juror misconduct had at sentencing.[6]

---

5. Karis' argument here is couched in terms of a prosecutorial misconduct claim, i.e., that but for the misconduct this evidence would have been excluded. To the extent that Karis argues that the evidentiary ruling was incorrect and violated due process, we reject that claim as well. To obtain habeas relief on such a claim Karis must demonstrate that admission of this testimony so fatally infected the proceedings it rendered his trial "so fundamentally unfair as to amount to a denial of [his] constitutional right to due process."

*Kealohapauole v. Shimoda*, 800 F.2d 1463, 1465 (9th Cir.1986). Karis fails to meet this standard.

6. Karis also alleges that one or more jurors consulted the dictionary for the definition of "circumstantial." The district court found the evidence insufficient to establish juror misconduct regarding the word "circumstantial" and we are not convinced that this finding was clearly erroneous. Accordingly, we decline to further address this claim.

## D. Ineffective Assistance of Counsel

### 1. Kevin Jones' Testimony

Karis argues that counsel was ineffective for failing to object to admission of his half-brother Kevin Jones' preliminary hearing testimony, for failing to move for exclusion of testimony regarding Kevin's statements to the police, and for consenting to the introduction of these statements. Kevin testified at the preliminary hearing, but suffered a stroke before trial and this testimony was read into the record. Parts of Kevin's testimony contradicted Karis' testimony and Kevin's preliminary hearing testimony was easily impeached by the prosecution because he had given a number of conflicting prior statements.

 To establish a claim for constitutionally ineffective assistance of counsel, Karis must show that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Campbell v. Wood,* 18 F.3d 662, 673 (9th Cir.1994) (en banc) (quoting *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)) (internal quotation marks omitted). In determining whether Karis received the reasonably effective assistance to which he was entitled, we must determine whether counsel's representation " 'fell below an objective standard of reasonableness.' " *Id.* (quoting *Strickland,* 466 U.S. at 687–688, 104 S.Ct. 2052). In so doing, we "will neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight," *id.,* but will defer to counsel's sound trial strategy. *See id.*

 Karis must also show that the deficient performance prejudiced him. In doing so, he must present a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*

 The district court found counsel's conduct reasonable in regard to the admission of Kevin's testimony. Karis' lead trial counsel stated that he was aware that Kevin's inconsistent statements could have been kept from the jury. He declared that his purpose was to put those statements before the jury in hope that he could persuade the jury to believe at least one part of Kevin's testimony—that Karis had arrived home from Placerville on July 8, 1981, by 10 a.m.—in order to corroborate Karis' alibi. In closing argument, defense counsel attempted to support Karis' alibi by pointing out that Kevin's first statement to the police corroborated Karis' story. Defense counsel testified in his deposition that Kevin's first statement to the police was the only available corroboration of Karis' alibi.

Furthermore, we agree with the district court that Karis was not prejudiced by counsel's failure to object to the evidence. There is not a reasonable probability that exclusion of this testimony would have changed the result of the proceeding.

### 2. Substance Abuse

 Karis also contends that evidence of his use of methamphetamines immediately preceding the crime could have explained his flight and the subsequent events in Sonoma County. Karis argues that trial counsel's failure to introduce this evidence rendered his assistance constitutionally ineffective. Even assuming that Karis could show that counsel acted unreasonably, Karis has not shown prejudice. Karis testified that he fled because he feared arrest for a parole violation as he was cultivating marijuana, a claim corroborated by evidence. While additional testimony of a drug-induced paranoia would

have provided additional support for his testimony, counsel's failure to present it does not undermine our confidence in the outcome of the proceedings and, thus, does not warrant the requested relief.

### 3. Genetic Marker Testing

██ Karis also claims that trial counsel should have objected to genetic marker testing evidence on the basis that the scientific method used was unreliable. Specifically, Karis targets the prosecutor's questions to James Streeter, the State's expert, that resulted in Streeter stating that only four percent of the population consisted of non-secretors, such as Karis. On cross-examination, however, defense counsel elicited Streeter's testimony that twenty-four percent of the male population could have contributed the semen. Defense counsel further clarified in his closing argument the significance or lack thereof of the statistics by describing how the prosecution stopped questioning Streeter after Streeter stated that only four percent of the population has Karis' blood type. Counsel explained that twenty-four percent of the population could have contributed the semen—"[t]hat means that if there were twelve male jurors in this case, three of them could have contributed that semen."

██ Trial counsel performed reasonably by discrediting the genetic marker testing evidence through his cross-examination of the State's expert and his closing argument. Even assuming *arguendo* that he did not, we agree with the district court's conclusion that Karis has failed to show that he was prejudiced by the testimony under the *Strickland* standard.

### E. Instructional Errors

██ Karis argues that the trial court's jury instructions erroneously barred the jury from considering his parole status as an explanation for his flight by limiting its consideration of the fact that a witness had been convicted of a felony. Specifically, the challenged instruction read as follows:

> The fact that a witness ... had been convicted of a felony, if such be a fact, may be considered by you only for the purpose of determining the credibility of the witness. The fact of such conviction does not necessarily destroy or impair the witness' credibility. It is one of the circumstances that you may take into consideration in weighing the testimony of such a witness.

The purpose of such an instruction is to prevent the jury from disregarding the testimony of a witness such as Karis merely because there was evidence that he had been convicted of a prior felony. It also serves to prevent the jury from using his prior conviction as evidence that he committed the current offense.

Karis contends that he fled because he was cultivating marijuana while on parole and feared being sent back to prison for such a parole violation. His explanation was supported by his neighbor David Marden who testified that Karis was growing marijuana and that he believed Karis left home out of fear of discovery. Still, Karis maintains that his parole status was critical to rebut the prosecution's argument that his flight reflected consciousness of guilt for the charged crimes. The trial court also read the jury the following "flight instruction":

> The flight of a person immediately after the commission of a crime or after he is accused of a crime is not sufficient, in itself, to establish his guilt, but is a fact which, if proved, may be considered by you in light of all other proved facts in deciding the question of his guilt or innocence.

Whether or not evidence of flight shows consciousness of guilt and the signifi-

cance attached to such circumstances are matters for your determination.

The trial court rejected Karis' request that this instruction include the possible reasons, other than consciousness of guilt, for his flight. Karis testified at trial that he fled because of his parole status and defense counsel argued this to the jury.

 Instructional error will not support a petition for federal habeas relief unless it is shown "not merely that the instruction is undesirable, erroneous, or even 'universally condemned,'" but that by itself the instruction "so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 146–147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). Karis has not made such a showing based on his allegations of instructional error. Many instructions were given regarding the evaluation of witness testimony and evidence generally. The instructions that Karis challenges could also have worked to his benefit to alleviate potential prejudice from consideration of his previous conviction and parole status, as could the flight instruction which clarified that flight alone is insufficient to establish guilt.

These instructions did not direct the jury to ignore Karis' explanation for his flight.

The challenged instructions did not render Karis' guilt trial fundamentally unfair and, thus, did not violate due process. Furthermore, even assuming Karis could meet that standard, which he did not, Karis' claims of instructional error fail to establish a constitutional violation that had a substantial and injurious influence on the jury's verdict. *See Brecht*, 507 U.S. at 638, 113 S.Ct. 1710.[7]

## F. Cumulative Error

 Although no single alleged error may warrant habeas corpus relief, the cumulative effect of errors may deprive a petitioner of the due process right to a fair trial. *See Ceja v. Stewart*, 97 F.3d 1246, 1254 (9th Cir.1996). That is not the case here. Karis has not shown the cumulative effect of the alleged errors deprived him of due process. *See id.*

## II. Penalty Phase Claims

### A. Ineffective Assistance of Counsel[8]

 Ineffective assistance of counsel ("IAC") claims involve a two-part inqui-

---

7. As discussed above, our precedent forecloses claims such as Karis' that we must apply *Chapman* as the standard of review where the state court did not. *Bains*, 204 F.3d at 977.

8. The State argues that this claim, among others, is procedurally barred under California's timeliness rule that a habeas petitioner must assert all claims known to him in a timely manner, and must fully explain and justify any substantial delay. We have previously recognized that "'[i]n order to constitute adequate and independent grounds sufficient to support a finding of procedural default, a state rule must be clear, consistently applied, and well-established at the time of the petitioner's purported default.'" *Morales v. Calderon*, 85 F.3d 1387, 1393 (9th Cir.1996) (quoting *Wells v. Maass*, 28 F.3d 1005, 1010 (9th Cir.1994)). In *Morales*, we held that California's timeliness rule, as applied to Morales and before its further elucidation in *In Re Clark*, 5 Cal.4th 750, 21 Cal.Rptr.2d 509, 855 P.2d 729 (1993), did not afford an adequate and independent state ground barring federal review of Morales's claims. *Morales*, 85 F.3d at 1393. The California Supreme Court denied Karis' last amended habeas petition in February 1992. Thus, as in *Morales*, California's rule on timeliness which *Clark* attempted to clarify in 1993, was not "clear, consistently applied, and well-established" at anytime after Karis' convictions were affirmed and before he filed his first state habeas petition. *See id.* Accordingly, Karis' claim of ineffective assistance of counsel in the sentencing phase is not procedurally barred. *See also Morris v. Woodford*, 229 F.3d 775, 780 (9th Cir.2000) (holding that "untimeliness" bar from *Clark* was not an independent and adequate state-law ground).

ry. Under *Strickland,* Karis must show that his counsel's performance was deficient, that is whether his performance "fell below an objective standard of reasonableness." *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052. In representing his client, trial counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052.[9]

■ Karis must also show that "the deficient performance prejudiced the defense." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. To make this showing, Karis must prove that "there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different." *Bonin,* 59 F.3d at 833. Such "reasonable probability" must be sufficient to undermine confidence in the outcome. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. To determine whether counsel's errors prejudiced the outcome of the trial, we must compare the evidence that actually was presented to the jury with that which could have been presented had counsel acted appropriately. *Bonin,* 59 F.3d at 834.

### 1. Deficient Performance

■ Magistrate Judge Moulds heard testimony for over two weeks and evaluated the credibility of the witnesses and the evidence presented in a well reasoned and documented 103 page opinion. The district judge stated that he carefully reviewed the entire file and found the findings and recommendations of the magistrate judge to be supported by the record and by proper analysis and adopted them in full. The magistrate judge's recommendations thus becomes the opinion of the district court.

■ The opinion of the district court considered and rejected a number of claims of ineffective assistance of counsel that may be summarized as follows:

a. The failure to examine the family history of mental illness was rejected because "counsel in 1982 was not constitutionally compelled to do the extent of family history research that petitioner's counsel now presents."

b. The failure to investigate drug abuse was rejected because "[p]etitioner has shown neither unreasonable conduct nor prejudice under *Strickland.*"

c. The failure to present evidence of mental illness was rejected stating: "although further effort by counsel might have yielded a better result, counsel's effort fell within the wide

---

9. The district court opinion cited the expert testimony of a criminal law specialist. The district court stated that he testified without contradiction that the standard of practice required penalty phase counsel:

to investigate, prepare and consider presenting evidence of the client's family history, including family dynamics, any physical abuse, mental and physical illness, and the family's socioeconomic status. Then, as now, every juror wanted to know where the defendant came from and how he came to site before them convicted of a capital crime. Jurors intuitively understand that some people are dealt a poor hand in life,

through their genetic and social inheritance and their family environment.

Penalty phase counsel was required to find and try to interview (either directly or through an investigator) all persons who were material witnesses to the client's genetic heritage, social history and life history. In particular, defense counsel was required to attempt to find and interview: the client, members of the client's immediate family, relatives and acquaintances who were percipient witnesses to the life history of the client, his parents and his immediate family, friends, . . . .

The district court observed that "Respondents presented no expert opinion to the contrary."

range of reasonable assistance described in *Strickland*."

d. The failure to present evidence of Karis' military record was rejected because "[t]his was a reasoned tactical decision."

e. The failure to object to the trial court's consideration of a probation office report was rejected because "petitioner has not shown a reasonable probability that, had counsel objected, the trial court would have overturned the jury's death verdict."

The careful consideration and rejection of these arguments concerning the ineffective assistance of counsel claims highlights the care with which the district court considered all of the ineffective assistance of counsel claims and in turn the care with which it entered its findings concerning the one ineffective assistance of counsel claim that it determined required the reversal of the death penalty aspect of the judgment. The district court found that counsel's failure adequately to investigate Karis' childhood, family situation and the serious abuse he suffered, and watched his mother suffer as a child, warranted reversal of the death penalty. The court's ultimate finding concerning counsel's deficient performance was:

There does not appear to have been any risk in presenting the mitigating evidence of abuse. In addition, there is no indication that conducting a further investigation of abuse was not possible. There is no showing that counsel lacked the time or money to conduct further investigations. "Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052. Petitioner's trial counsel has provided no rational justification for his failure to pursue an investigation into petitioner's history of family abuse. Accordingly, the court finds counsel's as-

sistance unreasonable under the Sixth Amendment.

With regard to the prejudice of counsel's failure to investigate, the district court found:

[H]ad counsel performed a proper investigation he could have offered substantial and wrenching evidence of petitioner's violent and abusive childhood. If this evidence had been offered at trial, it is likely that jurors would have concluded that petitioner witnessed his father and stepfather viciously beat his mother; that both men also beat and abused him; and that petitioner's father molested him. There is a "belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *Boyde v. California*, 494 U.S. 370, 382, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990). Thus, it is reasonable to expect that some jurors would have found this evidence especially important in understanding a defendant who had acted violently toward women. Considering the weak mitigation case put on, the prosecutor's focus on the lack of evidence of mental illness, and the strength of the evidence of abuse presented here, the court finds a reasonable probability that had counsel properly investigated and presented evidence of abuse, the result of the penalty phase would have been different. The court will recommend granting the petition for writ of habeas corpus on this basis.

Karis claims that counsel failed to investigate and present significant mitigating evidence of his childhood poverty, abuse, and the family dynamics. Karis' attorney had a duty to conduct reasonable investigation, including an investigation of Karis' background, for possible mitigating evi-

dence. Indeed, a substantial mitigating case may be impossible to construct without a life-history investigation. G. Goodpaster, "The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases," 58 N.Y.U. L. Rev. 299, 321 (May 1983). The supreme court has recognized the importance of informing the jury about the background and character of the defendant in a capital case.

The sentencer must also be able to consider and give effect to that evidence in imposing sentence. Only then can we be sure that the sentencer has treated the defendant as a uniquely individual human being and has made a reliable determination that death is the appropriate sentence.

*Penry v. Lynaugh,* 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (citations omitted).

The issue for the jury was whether Karis would live or die. We have emphasized the importance of presenting the available mitigating evidence in order for the jury to fairly make the vital determination of whether the defendant will live or die. We have noted that the failure to present important mitigating evidence in the penalty phase can be as devastating as a failure to present proof of innocence in the guilt phase. *Mak v. Blodgett,* 970 F.2d 614, 619 (9th Cir.1992). The Supreme Court has also recognized the importance of the use of a defendant's background as mitigation evidence:

[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.

*Boyde v. California,* 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990). The Supreme Court recently held that an attorney's failure to conduct an investigation that would have uncovered "extensive records graphically describing [the petitioner's] nightmarish childhood" constituted deficient performance. *Williams v. Taylor,* 529 U.S. 362, 363, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). As the Court explained, "[m]itigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case." *Id.* at 398, 120 S.Ct. 1495.

Karis' counsel presented mitigation evidence for only 48 minutes. In that short time, counsel called witnesses, eliciting that Karis had exhibited artistic and academic talent, that his mother had been divorced and that he had saved his brother from drowning when he was a child. While defense counsel offered this meager presentation, the district court findings are replete with evidence of abuse that should have been uncovered and presented by counsel upon any reasonable investigation and representation. Counsel's failure to present such substantial mitigating evidence was woefully inadequate and kept crucial information from the jury faced with sentencing Karis to life or death.

Penalty phase counsel acknowledged that evidence of abuse of Karis and of his mother when Karis was a child was relevant to the penalty phase case. Until a week prior to the penalty hearing Karis' counsel apparently intended to give the jury information on such abuse through the testimony and report of Dr. Albert Globus. Karis' guilt phase counsel hired Dr. Globus to evaluate Karis' mental status. Dr. Globus interviewed Karis' mother, Mrs. Jones, who told him that Karis' stepfather constantly beat her up and mistreated and beat Karis in order to get at her. Mrs. Jones stated that Karis' stepfather gave him little attention other than

this abuse or when Karis did something wrong.

Dr. Globus reported that Karis "no doubt experienced brutal abuse from his stepfather without sufficient cause and often as a result of his stepfather's anger at his mother." Dr. Globus described Karis' parental environment as "characterized by violence directed at his mother and himself" and that Karis' father and stepfather's abusive attitude toward his mother set the scene for the development of an acceptance of violence as the solution to social and interpersonal problems and a low opinion of women. Dr. Globus depicted Karis' stepfather as "brutal towards him and his mother," explaining that Karis was subjected to seeing his mother mistreated and being aware of some sexual abuse as well.

■■ Penalty phase counsel decided not to call Dr. Globus to testify at the penalty hearing because there was also damaging evidence in his report. We agree with the district court's conclusion that the decision not to use Dr. Globus to establish this childhood abuse was a tactical decision that did not violate *Strickland.* *See* 466 U.S. at 690, 104 S.Ct. 2052. However, counsel was admittedly on notice from Dr. Globus' report of substantial family abuse. Despite his conceded knowledge of this history, counsel failed to present any evidence of Karis' family abuse to the jury. Counsel maintains that he did not ask Karis' mother questions about this abuse at the penalty hearing because he did not know what she would say and that she had denied the abuse. She contends, however, that he never asked her and that if he had, she would have testified about it. Even taking counsel's statement as true, his failure to investigate the abuse through other family members and witnesses was error of constitutional magnitude. *See Smith v. Stewart,* 140 F.3d 1263, 1269 (9th Cir.1998) (concluding that counsel was deficient for

failing to "perform any real investigation into mitigating circumstances, even though that evidence was rather near the surface"). Counsel or his investigator spoke to only three of Karis' family members: his mother, his brother who had suffered brain damage, and his aunt.

The State argues that counsel had no duty to investigate this matter further because Karis and his mother were uncooperative. Counsel himself stated that "uncooperative" was probably an inaccurate word, rather that "[f]or whatever reason, they did not want to tell me the full extent of Mrs. Jones' prior life." The fact that they did not offer this information regarding the abuse did not excuse counsel from further investigation of such substantial mitigating evidence. This is particularly true where, as here, counsel was aware of the childhood abuse and there was essentially no other significant mitigating evidence to present to the jury.

[C]ounsel's duty to *investigate* mitigating evidence is neither entirely removed nor substantially alleviated by his client's direction not to *call* particular witnesses to the stand. Furthermore, a lawyer who abandons investigation into mitigating evidence in a capital case at the direction of his client must at least have adequately informed his client of the potential consequences of that decision and must be assured that his client has made "informed and knowing" judgment.

*Silva v. Woodford,* 279 F.3d 825, 838 (9th Cir.2002). In this case counsel was not instructed not to call his mother or to ask her about the abuse. Certainly he should have explained to her the gravity to her son in not testifying about the abuse. Even if she had denied it initially, which she disputes, he knew from Dr. Globus that it had occurred.

At the evidentiary hearing before the district court, Karis presented his mother's testimony about James Karis Sr.'s abuse of her and Karis. She gave numerous examples of the violent abuse that occurred:

Jim became obsessed with controlling me. He used to say to me, "I want to know every place you go and who you go with. I want to know exactly when you get off work, and where you go when you get off. I even want to know when you go to the bathroom." ... Jim told me that if he ever saw me smoking a cigarette, he'd "knock it clear down [my] throat." Once, I was so sick of his rules that I decided to do it anyway, and I took one of his Camels and started to light it up right in front of him. I had not even lit the cigarette before Jim grabbed it from me. He then made me swallow it whole, just like he had promised. I gagged and coughed but did not dare oppose him.

Jim was physically abusive towards me for years. I lived in fear of Jim throughout our marriage, and for several years after our divorce as well. He threatened to kill me and I knew he not only could but would if I crossed him. He had an unpredictable temper, and when I said something that angered him, he turned and slapped me with the back of his hand. When he was mad, Jim hit me and knocked me around the room, throwing me from wall to wall as if I were a ball on a pool table.

She described how she would beg him to stop beating her but he was beyond reason once he started. She stated that Jimmy was present during almost all of these fights. She further stated:

I filed for divorce from Jim in October, 1953, and our divorce became final in November 1954, when Jimmy was three years old. Even then, however, Jim was not out of my life. for almost two years after we separated, Jim threatened and intimidated me. He begged me to take him back. He parked his car outside my apartment and stared at my window for hours. He started following me to and from work, and leaving "reminders" to let me know he was watching me....

Jim also continued to beat me after our separation. We had loud, awful fights, and Jimmy was often there during them. I remember one time when Jim threatened to take Jimmy from me and never let me see him again, and I had to pull little Jimmy, crying, from Jim's arms....

Jimmy continued to see his father for regular visits, almost every single weekend, after our divorce. Jimmy's behavior seemed strange after these visits with his Dad. When he was just two or three years old, Jimmy began to call me curse names that he was too young to understand himself. I will always believe that Jimmy's daddy trained Jimmy to call me those slurs. After almost every visit with his father, Jimmy had some kind of injury—bruises on his legs, or something else that "hurt" him. Once, at age four, Jimmy came back from seeing his father with a circle-shaped burn on his hand. Jim told me that it was caused by his girlfriend, who had accidentally burned Jimmy with a car cigarette lighter.

She reported that she remarried when Karis was around five years old and that husband, Courtney Jones, also beat her up all the time and that they were caught up in an "exhausting cycle of violence." She described the first time he beat her up when she could not quiet their crying baby: "Courtney jumped out of bed, grabbed me, threw me on the floor. Then he sat on top of me, pinned me down, and hit me all over with his hands and fists." She further stated:

Courtney had a particular style of beating me. The most common thing he did was hold me close to him—either by grabbing my clothes or pinning me against a wall—and punch me over and over. He also kicked me, threw me down, and threatened to kill me. One threat Courtney used before he lit into me was, "I'll make you wish you were dead." Lots of times, he made me feel so powerless and afraid that I did want to die.

She testified that like Jimmy's father, Courtney was "insanely jealous."

Courtney followed me when I left the house, and told me when, where, and with whom I could go out. When I worked nights at a fast-food restaurant, Courtney often put the boys in the car, drove to the restaurant, and parked outside for hours while he watched me. One night, I got so sick of Courtney's rules that I decided to do something I knew would make him furious. I left the kids at home and went down to San Jose with a cousin of mine whom he despised.... When I got to our house, Courtney was in the bedroom with Kevin and Jimmy. He came out of the room and beat the living daylights out of me. He dragged me from room to room, punching me and throwing me against the walls. When we got to the kitchen, he threw me on the floor, picked up a trash can full of garbage, and dumped it all over me. When I lay there, he yelled, "Now take your damn kids and get out of my house!" For days afterwards, I had bruises all over my body, two black eyes, and I could hardly walk for a week.

She further stated that he would go after Jimmy to get at her and that if she told Courtney to stop calling Jimmy names or whipping him, it just made things worse. She recounted how Courtney favored his own son and berated Karis:

Courtney adored Kevin. He treated him like a king, doting on him and spoiling him. But Jimmy never got any of Courtney's love. Courtney never treated Jimmy like a son, and called him "you little wop" more often than he called him by his name.... If Jimmy and Kevin were happily playing together, Courtney would step in, take Jimmy away, and make him sit still against a wall to watch while Kevin played with all the toys himself.... Lots of times he came home from work, picked up Kevin, and asked him, "Did your Mama whip you today?" and "What did that little wop get away with today?".... Jimmy was scared to death of Courtney because of all the beatings, whippings, and threats.

She alleged extreme cruelty as grounds for divorcing him. She divorced him in March of 1961 when Jimmy was around nine years old.

Dr. Douglas Liebert's declaration reveals that several family members knew of Courtney's abuse. The district court record contains numerous declarations from her and others about this abuse yet Karis' lawyer presented none of this powerful and potentially life-saving evidence at sentencing. The opinion of the district court identified some of this evidence.

Petitioner has presented substantial testimony that James Sr. emotionally and physically abused Marie. Marlene Younger, Mrs. Jones' sister-in-law, knew that James Sr. treated Marie badly. She also testified that she cared for petitioner often when he was young. She noted that after visits with his father, petitioner "seemed different: he was hard to control, easily upset, and cried a lot for no apparent reason." Dona Williams, Mrs. Jones' sister, testified that she heard from her mother that James Sr. "was always beating Marie up." Tom Karis, James Sr.'s brother,

recalled that "Jim was violent with Marie, and I saw her with black eyes and bruises many times." (transcript references deleted).

Mrs. Jones testified that counsel did not ask her about abuse and that if asked she would have testified of the abuse at the penalty hearing. Marlene Younger, Karis' aunt also stated that she would have testified about Courtney Jones' abuse of Mrs. Jones if counsel had asked her about it. We are not persuaded by the State's argument that this performance was constitutionally sufficient under 1982 standards of practice.[10]

It is difficult to imagine what kind of standard the State conceives would allow counsel to rely almost solely on testimony that Karis was artistic and had academic potential to present a mitigating case, while failing to present *any* evidence of such substantial abuse to the jury for consideration in making a life or death determination for Karis. The defense counsel's portrayal of Karis as intelligent without any indication of his violent and abusive childhood afforded the prosecution a very effective argument. The prosecutor emphasized the fact that Karis was "bright" and "cunning" and that he "well knew exactly what he was doing." The prosecutor further argued that Karis was not "so lacking in ability" that he was "warped into being a killer," rather he had all the ability, "but he changed his life into that of visiting evil destruction and death."

As the district court found, counsel could have offered "substantial and wrenching evidence" of Karis' violent and abusive childhood. This information of Karis witnessing his father and his stepfather viciously beat his mother, in addition to both men beating and abusing Karis, is extremely probative as mitigating evidence.

Evidence of severe beatings that Karis' mother received from his stepfather, Jones, during the time that Karis was older and more inclined to have vivid recollection, would be highly relevant to mitigation as potentially having a serious effect on a child's attitude and treatment of women as he grew up. It should at least have been presented by the mother and others who could verify it for a jury to consider, even without Dr. Globus's elaboration on the effect it would have on a developing child.

The testimony before the district court was of severe beatings and treatment that could legitimately have severe effects on a young child's development and attitude. Based on the abundance of testimony at the evidentiary hearing regarding this abuse, the district court found that Karis' counsel had the opportunity to show that Karis grew up "seeing his mother regularly and violently abused by men." We agree with the district court that such evidence is particularly compelling mitigating evidence in a rape case.

### 2. Prejudice

■ As the district court found, "Petitioner's trial counsel has provided no rational justification for his failure to pursue an investigation into petitioner's history of family abuse." There was no strategic reason offered. The dissent believes the strategy was to end testimony with the mother crying on the stand. However, bringing out the abuse early in her examination would not have interfered with this strategy, in fact it would likely have enhanced it. How much more effective to have brought out the wrenching abuse she and Karis suffered and then leave the mother crying on the stand. A reasonable

---

10. See evidence of the 1982 standard in footnote 9. Moreover, in its opening brief, the State itself cites to testimony of guilt phase counsel that in 1982 an attorney was expected to present mitigation in the form of childhood problems.

investigation and witness preparation would have made this possible.

The dissent further contends that the result reached by the majority in this case is precluded by *Burger v. Kemp*, 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987). In that case the attorney made a strategic decision not to call witnesses to testify about his troubled family background because it would inevitably reveal his criminal juvenile background and his hair trigger violent temper, both of which the jury had no knowledge. This was "at odds with the defense's strategy of portraying petitioner's actions on the night of the murder as a result of[a codefendant's] strong influence upon his will." *Id.* at 793, 107 S.Ct. 3114. *Burger* has been distinguished in a number of cases in our circuit on the basis of this reasonable strategic choice, most recently by *Silva*, 279 F.3d at 844.

In Karis' case, as the district court found, there was no risk of putting on evidence of the wrenching abuse of Karis and his mother. It was within the range of reasonable tactics not to put Dr. Globus on the stand, but that does not excuse the failure to present the evidence of abuse through other witnesses. When the decision was made, shortly before trial, not to call Dr. Globus, the lack of thorough investigation left Karis' attorney unprepared to present what he had intended to be his major mitigating evidence. As he put it, he intended to make James Karis, Sr. and Courtney Jones the "heavies." Thus, as the district court found, "After deciding not to put on Dr. Globus, petitioner's counsel was left with little of consequence to present in mitigation. The only mitigating evidence concerned petitioner's artistic ability, his intelligence, and some limited testimony concerning his youth."

The dissent notes that the prosecutor asked no questions of the mitigation witnesses. This is no wonder, in that the prosecutor no doubt believed the testimo-

ny was of little consequence, and more importantly, it played right into his hands in the final argument he intended to make, and did make. The district court quoted a pertinent portion in its opinion:

> [W]e see Mr. Karis, not as an impoverished individual, not somebody who was void of talents, who's devoid of intellectual capacity, not somebody who, by virtue of being so poor as an individual, so lacking in ability was warped into being a killer. No, on the other hand, Mr. Karis has all of the ability, but he changed his life into that of visiting evil destruction and death on fellow human beings.... [D]espite Mr. Karis' abilities, despite his intellectual capacity, despite all of his talents, he has turned to base and immoral purposes. He grows marijuana for profit. He rapes for pleasure, and he kills to avoid apprehension.

Counsel's error in failing to investigate and present the highly relevant information of an abusive childhood, was prejudicial. A "reasonable probability" exists that a jury would find this information important in understanding the root of Karis' criminal behavior and his culpability. The prosecutor repeatedly stressed the absence of any testimony of mitigation throughout the penalty phase argument. With proper investigation, Karis' counsel could have put before the jury evidence contrary to the prosecution's piercing argument.

It is noteworthy that even with the weak mitigation evidence that was presented, the jury was out for three days before rendering its verdict. If evidence of Karis' violent and abusive childhood had been offered it is very likely that some jurors would have found such evidence particularly important in order to understand why he acted so violently towards women. As we have noted, there is a belief, "long held by this society, that defendants who commit criminal acts that are attributable to a

disadvantaged background or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *Boyde,* 494 U.S. at 382, 110 S.Ct. 1190.

■ Based on the weak mitigation case presented, the prosecutor's focus on the lack of mitigating evidence, and the substantial evidence of abuse presented to the district court, a reasonable probability exists that had counsel properly investigated and presented evidence of abuse, the result would have been different. In its opening brief on this appeal, the State reports that guilt phase counsel recalled Karis and his mother crying at the penalty phase and that he felt it was genuine, that the jury reacted to it, and that he thought it a particularly compelling moment. This further suggests the significant relevance that substantial evidence of violent childhood abuse would probably have had on the jury's decision of whether Karis should live or die. In light of the whole record, and despite the substantial evidence of aggravation, the failure of counsel to present mitigating evidence made the sentencing neither fair nor reliable. *See Hendricks,* 70 F.3d at 1044 (citing *Lockhart v. Fretwell,* 506 U.S. 364, 368–70, 113 S.Ct. 838, 122 L.Ed.2d 180).[11]

## CONCLUSION

We affirm the judgment of the district court granting the petition as to the penal-ty phase of the trial as modified herein and denying relief as to the remainder of the claims. We remand the case to the district court with instructions to grant the petition for a writ of habeas corpus unless the State within a reasonable period of time either corrects the constitutional error in Karis' death sentence or vacates the sentence and imposes a lesser sentence consistent with law.

AFFIRMED and REMANDED.

KLEINFELD, Circuit Judge, concurring in part and dissenting in part:

I concur in part I of the majority opinion, as to the guilt phase of the trial, but respectfully dissent as to part II, regarding the penalty phase. We should reverse the district court's grant of the habeas petition. The jury sentenced this man to death because of his horrible crimes, not because he had a bad lawyer. The majority opinion mistakenly treats counsel's failure to put on evidence of an abusive childhood as *per se* ineffective assistance, without the deference to defense counsel's judgments required by *Strickland .v. Washington.*[1]

### I. Ineffective Assistance

Like the majority, I am troubled by the brevity of the penalty phase defense. Sometimes a defense is brief because coun-

---

11. Because our decision entitles Karis to a new sentencing hearing, we do not address his other claims of error at the penalty phase with the exception of his constitutional challenge of California's sentencing scheme. With regard to this claim, we reject Karis' argument that the scheme does not adequately narrow the class of persons eligible for the death penalty. The California statute satisfies the narrowing requirement set forth in *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). The special circumstances in California apply to a subclass of defendants convicted of murder and are not unconstitutionally vague. *See id.* at 972, 103 S.Ct. 2733. The selection requirement is also satisfied by an individualized determination on the basis of the character of the individual and the circumstances of the crime. *See id.* California has identified a subclass of defendants deserving of death and by doing so, it has "narrowed in a meaningful way the category of defendants upon whom capital punishment may be imposed." *Arave v. Creech,* 507 U.S. 463, 476, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993).

1. 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

sel is not prepared. But in this case counsel thoroughly investigated and prepared. The problem was that the investigation turned up little evidence. The shortage of mitigating evidence was because Karis was a very bad man.

The majority opinion makes two central propositions: (1) "failure to investigate the abuse through other family members and witnesses was error of constitutional magnitude,"[2] and (2) "failing to investigate and present the highly relevant information of an abusive childhood [ ] was prejudicial."[3] These propositions are erroneous, because *Strickland* allows for no such absolutes. To show "deficient performance" under *Strickland,* a petitioner must show "that counsel made errors so serious that counsel was not functioning as 'counsel' guaranteed the defendant by the Sixth Amendment,"[4] and our scrutiny of counsel's conduct must be "highly deferential," evaluating it "from counsel's perspective at the time."[5]

The majority opinion concedes that "there was essentially no other significant mitigating evidence to present to the jury" except for evidence that Karis and his mother had both been abused during his childhood.[6] The problem in the majority's analysis arises because counsel investigated and discovered the abuse, but was precluded both by tactical considerations and by lack of cooperation from his witnesses from presenting it.

Karis committed the murder in this case twenty years ago and has litigated continually since then. This decades-long duration is typical of death penalty cases. The *Strickland* test, whether "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment,"[7] is emphatically not a question of whether during the decades following the trial any other lawyer or expert can come up with something new that might have helped the defense. We must view the facts "as of the time of counsel's conduct."[8]

The Supreme Court applied the general principles of *Strickland* in *Burger v. Kemp*[9] to facts that preclude the result in the case at bar. In *Burger,* defense counsel "offered no mitigating evidence at all,"[10] and put no witnesses on the stand,[11] while in the case at bar, mitigating evidence was presented through several witnesses. There was mitigating evidence that counsel could have presented in *Burger,* that "would have disclosed that petitioner had an exceptionally unhappy and unstable childhood."[12] In our case, it is considerably less clear, as I will explain below, that counsel could have presented more evidence to that effect. The lawyer in *Burger,* as here, "was aware of some, but not all, of this family history."[13] In *Burger,* as here, counsel talked with the petitioner's mother, though she claimed after the trial was over that his efforts were minimal.[14] He also talked with a lawyer

**2.** Maj. Op. at 1135.

**3.** *Id.* at 1140–41.

**4.** *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052.

**5.** *Id.* at 689, 104 S.Ct. 2052.

**6.** Majority at 1136.

**7.** *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052.

**8.** *Id.* at 690., 104 S.Ct. 2052

**9.** 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987).

**10.** *Id.* at 788, 107 S.Ct. 3114.

**11.** *Id.* at 791, 107 S.Ct. 3114.

**12.** *Id.* at 789, 107 S.Ct. 3114.

**13.** 483 U.S. at 790, 107 S.Ct. 3114.

**14.** *Id.*

who had befriended the petitioner and a psychologist.[15] The problem with the defense psychologist in *Burger* was that he concluded that petitioner's "psychopathology would make him want to do wrong,"[16] just as the problem with the defense psychiatrist, Dr. Globus, in our case was that he had very little good to say about Karis. The Court concluded in *Burger* that defense counsel's decision not to put anyone on the witness stand "may have been erroneous" but was "not unreasonable."[17] Though the Court in *Burger* concluded that defense counsel "could well have made a more thorough investigation,"[18] the decision to interview no further witnesses was not a constitutionally deficient judgment.[19] Despite the majority's conclusion that Burger's lawyer acted more strategically than Karis's, there is simply no way to avoid the force of *Burger* in this case.

Defense counsel was faced with a hard case to defend, and a hard defendant for whom to get sympathy. At the penalty phase of Karis's trial, the prosecution established Karis's previous rapes through the testimony of prior victims. He and another man had raped a woman in 1971, and he went to prison until 1975. Out of prison three months, he raped a high school girl, and went to prison for another five years. While still on parole for that recent rape, he raped one of the women in the case at bar. Instead of taking the lesson from his imprisonments that he should not commit rapes, he took the lesson that he should not leave witnesses alive. After he captured the two women in this case and raped one of them, he coldly shot them both to keep them from ever testifying against him.

Most of the possible defense witnesses posed problems. Karis's mother had lied for him twice to the police, so cross examination was threatening. The defense psychiatrist, Dr. Globus, reported to defense counsel that Karis was "involved" in the murder of another inmate, had "a very degrading opinion of the value of women," and had "a strong urge to destroy."

As for the abusive family environment— the hook that the majority opines might have gotten Karis enough sympathy to turn the jury in his favor—it did not, in Dr. Globus's report, sound likely to arouse much jury sympathy for this womanhating repeat rapist and murderer. (It sounds like a great deal more in the evidentiary hearing testimony, composed decades after trial, that the majority cites at great length). Karis's mother, though crying the whole time, told Dr. Globus that Karis did quite well in school until he started cutting classes in junior high. She and his natural father divorced when he was two, and he never saw his natural father again until he was sixteen. Karis himself told the psychiatrist that "he now thinks she should have supplied *more* discipline" when he was growing up. His complaint about her marriage that lasted for four years to his stepfather, from when he was nine, was "that the only time he received any attention was when he did something wrong and then he was usually beaten." His stepfather beat his mother and beat Karis with a belt, often with the buckle end. Karis did not report any recollection to the psychiatrist of any beatings by his natural father of his mother or himself.

Defense counsel in this case, unlike in *Burger,* put on a case, as substantial as he

15. *Id.* at 790–91, 107 S.Ct. 3114.

16. *Id.* at 791 n. 9, 107 S.Ct. 3114.

17. 483 U.S. at 792–93, 107 S.Ct. 3114, 107 S.Ct. 3114.

18. *Id.* at 794, 107 S.Ct. 3114.

19. *Id.* at 794–95, 107 S.Ct. 3114.

could, during the penalty phase. First he put on a prison official who testified about Karis's above average performance in the prison arts and crafts program, showing some potential for rehabilitation. Then he put on a woman who owned a craft shop, who testified that Karis had sold her items which she resold in her shop, demonstrating further Karis's ability to do something decent and useful. Another prison official testified to Karis's excellent crafts, and also to his constructive contribution to prison life as a guitar player. Then he put in by stipulation Karis's records from his college education, further showing rehabilitation potential. An instructor at the college testified to Karis's fine work in his geography class. He put on a stipulation that Karis's seventh grade teacher and counselor characterized him as a "very bright and sensitive child."

Then came Karis's mother, a triumph for the defense. Through her, the defense put into evidence photographs of "Jim" as a little boy and school report cards. She testified that she divorced Karis's father when he was about two, and he did not see him again until he was almost sixteen. Then defense counsel elicited that when Karis's little brother was five, he almost drowned at the ocean, and the mother "froze," but "Jim jumped in" and pulled him out as he was being "dragged under." She then began crying in front of the jury, and Karis began crying, too. She was excused without the prosecutor cross-examining her. Defense counsel could have asked for a recess until she stopped crying, and then examined her about the abuse of her and Karis, which he knew about from Dr. Globus's report. But he had good reasons not to: (1) he had reason to think, as I explain below, that she would give unhelpful answers; (2) he would lose the wonderful dramatic ending of her and her son crying as they recalled his life-saving heroics; and (3) the prosecutor might be moved to cross-examine, showing

that she had lied for Karis on two separate occasions to the police. Instead of taking that risk, he moved on to Karis's aunt, who testified about how upsetting it was to the boy when her husband, his uncle, who used to do a lot with the boy (talking, motorcycle riding, fishing, camping) died in a truck crash. The majority takes issue with this strategy, and says that the lawyer should have asked Karis's mother about the abuse before she started crying; he probably didn't know when she was going to start crying, and he couldn't count on her to say helpful things about the abuse.

This defense case could have taken a couple of days, had it stretched through lengthy cross examination, redirect, re-cross, redirect, and so forth until both sides brought out all they had and probed all the other side had brought out. But the prosecutor employed a clever tactic to deflate the defense case and shorten it. He made no objections. After each witness testified, he said "no questions." That prosecution tactic made the defense case for mitigation go very fast indeed and robbed it of the force it would have had, had cross examination stretched it out, by implying that it was so insubstantial as not to need challenge.

Thus, defense counsel investigated, prepared, and presented a case with six witnesses and one other by stipulated testimony, as well as exhibits. The majority concedes, as it must, that Dr. Globus's harmful opinion, despite his being hired by the defense, made it reasonable not to present his testimony. Defense counsel had consulted two other doctors as well, without getting anything useful. The majority says that what defense counsel did wrong was that he failed to present evidence that when Karis was a child, his natural father and his stepfather viciously beat his mother, and also beat Karis. The majority says that defense counsel should

have presented evidence of abuse "through other family members and witnesses."[20]

Defense counsel had initially planned to put on proof of the abuse. The reason defense counsel had not talked to the father and stepfather was that he had planned to "make them out to be the heavies" and did not want them to contact the prosecutor with his plans and undermine the only evidence he had. But when defense counsel asked Karis's mother about the abuse, "she denied ... telling Dr. Globus what Dr. Globus had written in the report." She was at that time "good friends" with the stepfather and counsel feared that she would protect him. Failing to ask her about the abuse on the stand, or to bring it out from someone with less knowledge than her, might have denied Karis mitigating evidence, or it might have avoided a worse situation in which the mother would destroy defense counsel's credibility with the jury by denying that it had occurred because she wanted to preserve her relationship with the stepfather. And he could not even count on his own client to back him up. Karis told defense counsel he did not want defense counsel to ask his mother about the beatings. The majority quotes extensively from what the mother and others said years later, in the evidentiary hearing, while Karis was on death row. The evidentiary hearing took place long after the mother's relationship with the stepfather may have evaporated. Counsel had sensible tactical reasons for not doing more with the abuse when the case was tried

and Karis's mother was still "good friends" with the abusive stepfather.

*Williams v. Taylor*[21] does not control, because in that case, the lawyer did not look into the defendant's background at all, never found out about the defendant's juvenile records which contained ample evidence of abuse, and admitted in closing argument that it was difficult "to find a reason why the jury should spare [his] life."[22] In this case, defense counsel made "a reasonable investigation such that [he was] able to make informed decisions about how best to represent [his] client[ ],"[23] and "made a showing of strategic reasons for failing to" introduce the evidence.[24]

## II. Prejudice

*Strickland* also requires that the petitioner "affirmatively prove prejudice."[25] "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding."[26] Rather, Karis must show that there was a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[27] A reasonable probability is one that "undermine[s] confidence" in the jury's decision.[28] In the case at bar, all we have is a "conceivable" possibility that *Strickland* says is not enough, not a "reasonable probability" such that confidence in the jury's decision is undermined.

Maybe the jury would have felt very sorry for Karis had it learned about the child abuse, and maybe the mother would

20. Maj. Op. at 1134.

21. 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

22. *Id.* at 369, 120 S.Ct. 1495.

23. *Caro v. Calderon*, 165 F.3d 1223, 1226 (9th Cir.1999).

24. *Id.*

25. 466 U.S. at 693 104 S.Ct. 2052.

26. *Id.*

27. *Id.* at 694, 104 S.Ct. 2052.

28. *Id.*

have changed her story again and admitted it, had counsel asked her while she was on the stand, even though she had denied it when he prepared her to testify. Or maybe she would have denied it, and ruined the humanizing testimony counsel had put on, with the chorus of crying about Karis saving his brother's life. And maybe the jury would have thought that a baby who did not remember his mother being beaten before he was two would not have been so traumatized as to mitigate murder. Maybe the jury would have found mitigation for a man who had suffered beatings with a belt for four years of his childhood. Or maybe some jurors would have said "I was beaten with a belt and I haven't killed anyone," and learned as the issue was explored that Karis had told Dr. Globus that he thought his mother had not disciplined him enough. The mitigation is speculative at best, especially in light of Karis's merciless multiple rapes and cold blooded murder to avoid apprehension.

In any case, it is possible to wonder whether "if only counsel had done something different," the result would have been different. But neither that kind of wondering, nor the evidence that can be developed in the decades following trial, is enough to show prejudice.

### III. Conclusion

Karis has not presented any evidence that errors by counsel, if they were errors at all, were so grave "that it is as though he had no lawyer at all in the Sixth Amendment sense."[29] Nor has he demonstrated prejudice from failure to prove abuse of his mother and himself. Though a jury in this case, as in any case, could have gone the other way, it was not counsel's fault that it did not. The law and the

facts preclude relief on the basis of ineffective assistance of counsel.

---

**29.** *Caro,* 165 F.3d at 1234 (Kleinfeld, J., dissenting).

