David Pineda OLIVA, Petitioner,

v.

Anthony HEDGPETH, Respondent.

No. CV 08–3772–ODW (E).

United States District Court,
C.D. California.

Feb. 9, 2009.

Marilee Marshall, Marilee Marshall & Associates, Los Angeles, CA, for Petitioner.

Marc A. Kohm, CAAG—Office of Attorney General of California, Los Angeles, CA, for Respondent.

## ORDER ADOPTING FINDINGS, CONCLUSIONS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE

OTIS D. WRIGHT, II, District Judge.

Pursuant to 28 U.S.C. § 636, the Court has reviewed the Petition, all of the records herein and the attached Report and Recommendation of United States Magistrate Judge. The Court approves and adopts the Magistrate Judge's Report and Recommendation.

IT IS ORDERED that the Petition is conditionally granted. Respondent shall discharge Petitioner from all adverse consequences of the judgment in Superior Court action No. BA248106, unless Petitioner is brought to retrial within ninety (90) days of the entry of Judgment herein, plus any additional delay authorized under State law.

IT IS FURTHER ORDERED that the Clerk serve copies of this Order, the Magistrate Judge's Report and Recommendation and the Judgment herein by United States mail on Petitioner, counsel for Petitioner, and counsel for Respondent.

LET JUDGMENT BE ENTERED ACCORDINGLY.

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

CHARLES F. EICK, United States Magistrate Judge.

This Report and Recommendation is submitted to the Honorable Otis D. Wright, II, United States District Judge, pursuant to 28 U.S.C. section 636 and General Order 05–07 of the United States District Court for the Central District of California.

### PROCEEDINGS

Petitioner filed a "Petition for Writ of Habeas Corpus By a Person in State Custody" on June 9, 2008, accompanied by a Memorandum of Points and Authorities ("Pet. Mem."). Respondent filed an Answer on September 2, 2008. Petitioner filed a Reply on October 13, 2008.

### BACKGROUND

A jury found Petitioner guilty of the first degree murder of Jeovanni Acosta [1] in violation of California Penal Code section 187(a) (Reporter's Transcript ["R.T."] 858–59; Clerk's Transcript ["C.T."] 181–83). The jury found true the allegations that Petitioner: (1) personally used a firearm within the meaning of California Penal Code section 12022.53(b); (2) personally and intentionally discharged a firearm within the meaning of California Penal Code section 12022.53(c); and (3) personally and intentionally discharged a firearm which proximately caused great bodily injury and death to Jeovanni Acosta within the meaning of California Penal Code section 12022.53(d) (R.T. 858–59; C.T. 181–83). Petitioner received a sentence of fifty years to life (R.T. 885–87; C.T. 257–28).

---

1. The victim's first name is spelled as both "Jeovanni" and "Giovanni" in the Reporter's Transcript. The Court employs the spelling used in the Information and the verdict form (*see* C.T. 87–89, 181).

Petitioner appealed, and also filed a companion habeas petition in the California Court of Appeal (Respondent's Lodgments 3, 6). The Court of Appeal affirmed the judgment and denied the habeas petition (Respondent's Lodgment 7); *see People v. Oliva*, 2006 WL 3825072 (Cal.Ct. App.2d Dist. Dec. 29, 2006). The California Supreme Court denied Petitioner's petition for review summarily (Respondent's Lodgment 11).

## SUMMARY OF TRIAL EVIDENCE

### I. *Prosecution's Evidence*

#### A. *Testimony of Ralph Seaton*

Ralph Seaton testified as follows:

Sometime between 5:00 and 6:00 p.m. on October 5, 2002, Seaton stopped at a stop light in his brown car (R.T. 219–20). Seaton lived in the neighborhood and had seen drug transactions at that particular corner (R.T. 218, 226–27, 247).

Seaton heard a sound "like firecrackers going off" (R.T. 221). Seaton saw a car going very slowly through the intersection (R.T. 221). Seaton saw a person straddling a bicycle next to the car (R.T. 221, 224). The person on the bicycle leaned toward the driver's side of the car, and Seaton saw that the person was holding a gun sideways and pointing the gun into the car (R.T. 221–23). Seaton heard more shots (R.T. 221). The car moved ahead and struck Seaton's car (R.T. 223–26). Seaton did not see the man on the bicycle again (R.T. 225). Seaton exited his car, looked into the other car, saw the victim lying on the seat, and saw a considerable amount of blood (R.T. 226, 238). Seaton had never seen the victim before (R.T. 226, 238).

At trial, Seaton could not describe the man on the bicycle, and said he did not pay attention to the man's features (R.T. 244–45, 248). Seaton did not recall telling police the man was a male Hispanic with a medium complexion, dark hair and dark clothing (R.T. 228–29). On cross-examination, Seaton said that he did not recognize Petitioner, and that he, Seaton, could not say whether he saw Petitioner at the intersection that evening or not (R.T. 247–48). On redirect, Seaton said Petitioner "definitely could have been" at the intersection that night (R.T. 248).

#### B. *Testimony of Maria Cardenas*

Maria Cardenas testified as follows:

On the day of the shooting, Maria Cardenas and her two children were visiting Cardenas' mother (R.T. 548–49). At approximately 6:00 p.m., Cardenas was outside putting her children in her van to go home when she noticed approximately five young male Hispanics on bicycles on the corner across the street (R.T. 549–51, 582). One of the bicyclists was in the intersection riding in circles, yelling and waving his right hand in the air (R.T. 551–55). Cardenas was not sure if the person had anything in the hand he was waving (R.T. 554). The person was wearing below-the-knee shorts and a dark jersey-type shirt with stripes near the ends of the sleeves (R.T. 577–79). Cardenas thought he was a teenager from the way he was dressed (R.T. 582).

The other bicyclists disappeared (R.T. 555, 577). Cardenas saw the remaining bicyclist head down the street, and then heard a shot (R.T. 556). Cardenas told her children to go into the house (R.T. 556). Cardenas saw a car driving very slowly (R.T. 556). The car's occupant went down and looked dead (R.T. 556, 559). The car hit a brown car driven by an older man (R.T. 557). Cardenas did not see the person on the bicycle again (R.T. 558).

Cardenas testified that, as the person circled near Cardenas, she got a good look at him (R.T. 576). Cardenas said that she

was "staring at the scene," and that "[u]nfortunately, [she] did look at his face" (R.T. 579). However, Cardenas said she testified truthfully at the preliminary hearing that she did not get a good look at the bicyclist's face because she was nearsighted (R.T. 580). Cardenas said she always wore glasses (R.T. 581–82).

Cardenas admitted describing the person on the bicycle to police as having a shaved head, but said she meant that he had very short hair (R.T. 582–83). Cardenas told police the person was between the ages of 18 and 25 and had no facial hair (R.T. 585).

Asked whether the person she saw riding the bicycle in the middle of the intersection was in court, Cardenas said "I think so" (R.T. 560). The judge asked: "Is there anyone in here who you believe is the individual?" (R.T. 560). Cardenas said: "I don't know" (R.T. 560). Asked whether there was someone in the courtroom whom Cardenas thought was the person on the bicycle, Cardenas then identified Petitioner (R.T. 560). Cardenas had never seen Petitioner before the day of the shooting (R.T. 561). Petitioner looked different in court because he was thinner and had a mustache and more hair (R.T. 562).

On October 18, 2002, Detective Baker had shown Cardenas a series of photographs (R.T. 563). Prior to doing so, Baker told Cardenas that the person on the bicycle might or might not be depicted in the photo lineup (R.T. 563, 590). Cardenas identified Petitioner and circled his picture (R.T. 564). Cardenas wrote: "Number 3 is the person that to me looks like the guy on the bike before the shooting. He was light skinned Hispanic. He was heavy set and short. Hair black or dark brown." (R.T. 567). Cardenas said that, although Petitioner looked different in court because Petitioner was thinner and had more hair and more facial hair, Petitioner looked the same as the person she saw on the

bicycle (R.T. 564–66). Cardenas said she also identified Petitioner by the back of his neck and his shoulders (R.T. 566).

On cross-examination, Cardenas said that, when she picked Petitioner's photograph from the photo lineup, she told the detectives that she was not certain (R.T. 588–89). The photo lineup appeared to show three older men and two younger men (R.T. 603). Cardenas said she wavered between the photograph of Petitioner and a photograph from another photo lineup, but finally chose that of Petitioner because he looked more like the person she saw on the bicycle that day (R.T. 589, 592, 605). Cardenas admitting telling the detectives that she chose Petitioner's photograph because of the shape of the face and shoulders (R.T. 591). Cardenas explained that she had not wanted to say anything, but knew she had to do so, and told the detectives she was afraid and did not want to put the wrong person in jail (R.T. 588–89, 592). When Petitioner's counsel asked: "You simply cannot say with any certainty that [Petitioner] is the person that you saw on the bike, can you?", Cardenas responded: "I don't know because he's thin. He's sitting down right now and his hair is different. The shape of his face is different. It looks like he's thinner. And—I don't know." (R.T. 592–93). Petitioner's counsel then asked: "So, Ms. Cardenas, it's true that even today you are not certain whether this was the individual?" (R.T. 595). Cardenas replied: "I don't know" (R.T. 595).

On redirect, the prosecutor said "... you saw him [Petitioner] in the intersection that day?" and Cardenas responded: "yes" (R.T. 601).

### C. *Testimony of E.R.*

E.R., Cardenas' niece, was a six-year-old first grader at the time of the incident (R.T. 480, 482, 571). E.R. and her cousin

A.R. were playing outside at the home of E.R.'s grandmother on the day in question (R.T. 482–83). E.R. said she saw a person on a bicycle kill a person in a car (R.T. 484). Asked if the person on the bicycle was a boy or a girl, E.R. responded that the person was a boy (R.T. 484). E.R. said she had seen him before in the neighborhood and recognized him (R.T. 497, 540). Asked where E.R. previously had seen the person, E.R. said: "I forgot" (R.T. 497).

E.R. recalled that the boy on the bike was yelling and saying bad words before he shot the person in the car (R.T. 485–87). E.R., who was approximately fifteen feet away, saw a gun in the right hand of the shooter prior to the shooting (R.T. 487–88, 499). E.R. saw only one person in the car (R.T. 530). The shooter pointed the gun into the car, shot the person in the car, and rode away on the bicycle (R.T. 488–89). At first, E.R. said she saw the front windows of the car break, later said she told Detective Baker the back window had been shot, and then said she could not remember which window was shot (R.T. 490–91, 532–33). E.R. said she saw the boy on the bicycle again two days after the shooting (R.T. 498, 543).

E.R. said she was sure that she did not see the shooter in the courtroom (R.T. 492–93). E.R. recalled talking with Detective Baker after the shooting, and recalled that Baker showed her some pictures (R.T. 493). E.R. said that, when she looked at the pictures, she saw the shooter and picked him out (R.T. 493–97). E.R. signed the document bearing the photograph and circled the photograph of Petitioner (R.T. 495–96). E.R. said she saw the shooter's face and was sure she knew who it was (R.T. 500). Shown a photograph of one of Anthony Tiznado's bicycles, E.R. said the bicycle looked like the one she saw the shooter riding (R.T. 501–02).

On cross-examination, E.R. said the shooter wore above-the-knee shorts and a black shirt (R.T. 510–12). Asked whether the person was wearing a dark jacket, E.R. said "yes" (R.T. 510). Asked what she meant by "jacket," E.R. said "[a] sweater" (R.T. 511). E.R. said the jacket did not have a hood, but admitted she told the police that the shooter was wearing a dark hooded sweatshirt and that the person did have a hood (R.T. 511, 515–16). E.R. said that the hood was down, and that the shooter was bald, with a shaved head and no facial hair (R.T. 514–16). E.R. recalled telling Detective Baker she saw two persons in the car (R.T. 531–32).

Also on cross-examination, E.R. said that, when she was shown the photo lineup and asked whether she recognized anyone, she started looking at all of the pictures and then pointed to photograph number 1 "because he looked like his face," meaning the face of the person on the bicycle (R.T. 522, 526–27). E.R. said she changed her selection to photograph number 3, and circled that photograph as Detective Baker requested (R.T. 528–29). E.R. testified that she thought that one of the photographs must have been that of the shooter, and that she thought she had to make a selection of one of the photographs (R.T. 527).

On redirect, E.R. said she picked photograph number 3 because Detective Baker told her to pick him (R.T. 540–41). The prosecutor asked: "He told you to pick him or told you to circle the boy that was on the bike?" (R.T. 541). E.R. said: "Circle the boy who was on the bike" (R.T. 541). E.R. said that the people in photographs numbered 1, 2, 4, 5, and 6 were not the boy on the bicycle, and that the person in photograph number 3 was the boy on the bicycle (R.T. 541–42). E.R. reiterated that the person in photograph number 3 was the shooter, even though the person in photograph number 3 had hair and a mustache (R.T. 542–43).

### D. *Testimony of Anthony Tiznado*

Petitioner's friend Anthony Tiznado, aged 17 at the time of the shooting, testified that he was at home on October 5, 2002 when he heard a loud noise like a firecracker (R.T. 305–06, 362). A few minutes later, Tiznado went outside to his front porch (R.T. 306–07). Tiznado saw two cars crash, a blue car and Seaton's brown car (R.T. 309–10, 321–22). Tiznado saw a crowd of people, a police car, and, on a bike, a friend of his named Antonio who looked like he was crying (R.T. 308–12). Tiznado thought he remembered telling Detective Baker and the prosecutor that Antonio said Antonio's friend had been shot (R.T. 318).

Tiznado owned three bicycles which he loaned to friends (R.T. 335–36). Asked whether he loaned his bikes to Petitioner, Tiznado responded: "He don't like riding bikes" (R.T. 336). Tiznado admitted lending a bike to Petitioner a couple of times, however, and said Tiznado's brother could have loaned Petitioner a bike when Tiznado was not present (R.T. 337). Tiznado said he had not loaned a bike to Petitioner on the day of the shooting (R.T. 353, 363).

Tiznado thought he saw Petitioner drive his blue El Camino by the location of the incident on the day of the shooting (R.T. 340–41, 345, 353–54, 357–58). Tiznado said he had seen a person named Valentin driving the blue car in the past (R.T. 322–23). Tiznado had seen the victim in the past in an area called the Village, and also recalled seeing Petitioner in the Village (R.T. 331, 334).

### E. *Detective Erik Baker*

Detective Baker testified as follows:

Called to the scene, Baker spoke to Ralph Seaton (R.T. 276). Seaton described the shooter as a male Hispanic between the ages of 15 and 17 who looked like a gang member and "looked similar to other gang member type people" who hung out on the corner selling drugs (R.T. 275–77). Seaton told Baker that Seaton could not identify the person on the bicycle (R.T. 290, 293). Baker inspected the victim's car, noting that there was blood on the front seat and that the back window on the driver's side was shattered (R.T. 654–55).

On October 17, 2002, police arrested Steven Galaviz near the site of the incident for possession for sale of rock cocaine (R.T. 279–80). After interviewing Galaviz, Baker located and followed a blue El Camino containing Petitioner and Anthony Tiznado (R.T. 279–83, 293). The car stopped at Tiznado's residence, near the intersection where the shooting had occurred (R.T. 281–82, 285). Petitioner initially gave the officers a false name (R.T. 283–87, 433). According to Baker, Petitioner's appearance at trial looked different from the booking photograph of Petitioner taken on October 18, 2002 (R.T. 295–96). At trial, Petitioner looked "a lot thinner" and had longer hair (R.T. 297). Petitioner's hair was "more sketchy" in 2002 and appeared to have been trimmed recently (R.T. 297).

In a subsequent interview, Tiznado told Baker that Tiznado's bicycles were available for Petitioner's use, and that Petitioner would borrow a bicycle when Petitioner wanted to go to the store (R.T. 430–32). Tiznado told Baker that Petitioner was dating two women, one of whom lived in the Village (R.T. 436). Steven Galaviz, Tiznado's brother, told Baker that Tiznado permitted Petitioner to borrow Petitioner's bicycles (R.T. 379, 438, 442).

Baker interviewed Maria Cardenas on October 18, 2002 (R.T. 663). According to Baker, Cardenas was afraid for her safety (R.T. 686, 698). Prior to showing Cardenas some photographs, Baker read Cardenas an admonition indicating, *inter alia,* that the photographs might or might not contain a photograph of the person who

committed the crime (R.T. 665–66). Petitioner's booking photograph, taken on October 18, 2002, was in position number 3 (R.T. 661–62, 675–76). Cardenas circled photograph number 3 (R.T. 667). Cardenas mentioned that, at the scene of the incident, there was "a whole bunch of people [who] looked like him," and expressed the hope that she was not choosing the wrong person (R.T. 702–03). However, Cardenas told Baker that, on a scale of 1 to 10, Cardenas' level of certainty was 8 or 9 (R.T. 679, 698–99).

Baker showed the photo lineups to Seaton, but Seaton indicated he could not identify anyone (R.T. 673). Baker said Seaton "really didn't look at any of the photos" (R.T. 673).

Baker interviewed E.R. on October 24, 2002 (R.T. 659). Baker showed a photo lineup to E.R. without first giving E.R. the admonition that the photographs might or might not contain a photograph of the person who committed the crime (R.T. 661). Baker claimed he did not give E.R. this standard admonition because he thought the "verbiage" in the admonition was "a little mature" for E.R. (R.T. 687–88). Baker reportedly did not tell E.R. that she had to pick someone out (R.T. 663). Baker asked E.R. whether she recognized anyone in the pictures (R.T. 688). In response, E.R. pointed to photograph number 1, which was a photograph depicting someone other than Petitioner (R.T. 688). Baker asked E.R. where she recognized that person, and E.R. said: "I forgot" (R.T. 691). Baker asked whether E.R. had seen him around the neighborhood (R.T. 691–92). Baker supposedly realized that his question had been unclear because he had not asked E.R. to identify the person on the bicycle (R.T. 688). Baker then said: "Look at all six pictures again and see if you can recognize the guy that was on the bike that night in any of those six pictures" (R.T. 692). Baker used his finger to point to each of the six photographs and asked whether E.R. recognized that person as the boy on the bike (R.T. 693–94). Referring to photograph number 1, Baker said: "That's not where you recognize this guy from, is it?" (R.T. 692). E.R. indicated "no" (R.T. 692–93). When Baker pointed to photograph number 2, E.R. again indicated "no" (R.T. 694). When Baker pointed to photograph number 3, E.R. nodded and said "yes" (R.T. 694). E.R. said the person in photograph number 3 had shot the person in the car (R.T. 694). E.R. reportedly did not waver in her identification (R.T. 662–63, 695). After E.R. circled the photograph and wrote her name, Baker said: "Awesome." (R.T. 703–04). Baker then continued through the rest of the photographs (R.T. 694–95). E.R. did not choose any of the remaining photographs (R.T. 695).

### F. *Other Prosecution Evidence*

Steven Galaviz, Tiznado's older brother, testified that Tiznado always kept his bikes locked up (R.T. 379, 385). Galaviz had not seen Tiznado loan his bikes to friends (R.T. 386).

Valentin Rojas testified that he loaned his car to the victim on the day of the shooting (R.T. 638–39). When the car was returned to Rojas after the shooting, the front and back passenger windows were cracked (R.T. 644–45).

A deputy medical examiner testified that the victim died from gunshot wounds to the head and scrotum (R.T. 461–68).

### II. *Defense Case*

The defense called no witnesses, but introduced a stipulation that eight-year-old A.R. was interviewed at her residence and recounted that, on the day of the incident, A.R. was standing in the front yard of her house when she saw a suspect on a bicycle stopped in the street (R.T. 706). A.R. said

that the victim stopped his car with his driver's window adjacent to the suspect, and A.R. heard the victim and the suspect yelling back and forth (R.T. 706). A.R. saw the suspect produce a handgun and fire several rounds at the victim (R.T. 706). A.R. heard three shots and the sound of breaking glass (R.T. 706). A.R. described the suspect as a male Hispanic with a shaved head, approximately 16 to 20 years old, wearing a dark-colored hooded sweatshirt, blue denim calf-length shorts and white socks, and riding a small bicycle, possibly a BMX type (R.T. 706).

## PETITIONER'S CONTENTIONS

Petitioner contends:

1. Petitioner's trial counsel allegedly rendered ineffective assistance by: (a) failing to move to suppress E.R.'s pretrial identification; and (b) failing to call an eyewitness identification expert; and

2. The evidence allegedly was insufficient to support Petitioner's conviction.

## STANDARD OF REVIEW

Under the "Antiterrorism and Effective Death Penalty Act of 1996" ("AEDPA"), signed into law April 24, 1996, a federal court may not grant an application for writ of habeas corpus on behalf of a person in state custody with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim: (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d) (as amended); see also Woodford v. Visciotti, 537 U.S. 19, 24–26, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002); Early v. Packer, 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002); Williams v. Taylor, 529 U.S. 362, 405–09, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

"Clearly established Federal law" refers to the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision. Lockyer v. Andrade, 538 U.S. 63, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). A state court's decision is "contrary to" clearly established Federal law if: (1) it applies a rule that contradicts governing Supreme Court law; or (2) it "confronts a set of facts ... materially indistinguishable" from a decision of the Supreme Court but reaches a different result. See Early v. Packer, 537 U.S. at 8, 123 S.Ct. 362 (citation omitted); Williams v. Taylor, 529 U.S. at 405–06, 120 S.Ct. 1495.

Under the "unreasonable application prong" of section 2254(d)(1), a federal court may grant habeas relief "based on the application of a governing legal principle to a set of facts different from those of the case in which the principle was announced." Lockyer v. Andrade, 538 U.S. at 76, 123 S.Ct. 1166 (citation omitted); see also Woodford v. Visciotti, 537 U.S. at 24–26, 123 S.Ct. 357 (state court decision "involves an unreasonable application" of clearly established federal law if it identifies the correct governing Supreme Court law but unreasonably applies the law to the facts).

A state court's decision "involves an unreasonable application of [Supreme Court] precedent if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply, or unreasonably refuses to extend that principle to a new context where it should apply." Williams v. Taylor, 529 U.S. at 407, 120 S.Ct. 1495 (citation omitted).

"In order for a federal court to find a state court's application of [Supreme

Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous." *Wiggins v. Smith,* 539 U.S. 510, 520, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (citation omitted). "The state court's application must have been 'objectively unreasonable.'" *Id.* at 520–21, 123 S.Ct. 2527 (citation omitted); *see also Davis v. Woodford,* 384 F.3d 628, 637–38 (9th Cir.2004).

In applying these standards, this Court looks to the last reasoned state court decision. *See Delgadillo v. Woodford,* 527 F.3d 919, 925 (9th Cir.2008). If the state courts did not decide a federal constitutional issue on the merits, this Court must consider that issue under a *de novo* standard of review. *See Pinholster v. Ayers,* 525 F.3d 742, 756 (9th Cir.2008) ("De novo review applies if the state court did not reach the merits of a particular issue.") (citation omitted).

## DISCUSSION

**I. *Petitioner Is Entitled to Habeas Relief on His Claim That Trial Counsel Ineffectively Failed to Move to Suppress E.R.'s Pretrial Identification.***

### A. *Legal Standards*

To establish ineffective assistance of counsel, Petitioner must prove: (1) counsel's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland v. Washington,* 466 U.S. 668, 688, 694, 697, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ("*Strickland*"). A reasonable probability of a different result "is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052. The court may reject the claim upon finding either that counsel's performance was reasonable or the claimed error was not prejudicial. *Id.* at 697, 104 S.Ct. 2052; *Rios v. Rocha,* 299 F.3d 796, 805 (9th Cir.2002)

("Failure to satisfy either prong of the *Strickland* test obviates the need to consider the other.") (citation omitted). For purposes of habeas review under 28 U.S.C. section 2254(d), *Strickland* sets forth clearly established Federal law as determined by the United States Supreme Court. *See Williams v. Taylor,* 529 U.S. at 391, 120 S.Ct. 1495 (citation and quotations omitted).

■■■ Review of counsel's performance is "highly deferential" and there is a "strong presumption" that counsel rendered adequate assistance and exercised reasonable professional judgment. *Williams v. Woodford,* 384 F.3d 567, 610 (9th Cir.2004), *cert. denied,* 546 U.S. 934, 126 S.Ct. 419, 163 L.Ed.2d 319 (2005) (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052). The court must judge the reasonableness of counsel's conduct "on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. The court may "neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight." *Karis v. Calderon,* 283 F.3d 1117, 1130 (9th Cir.2002), *cert. denied,* 539 U.S. 958, 123 S.Ct. 2637, 156 L.Ed.2d 655 (2003) (citation and quotations omitted); *see Yarborough v. Gentry,* 540 U.S. 1, 8, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) ("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight.") (citations omitted). Where, as here, the record contains counsel's statement of reasons for his or her alleged action or inaction, the issue is whether those reasons were reasonable in the circumstances. *See Moore v. Czerniak,* 534 F.3d 1128, 1144 (9th Cir.2008). Petitioner bears the burden to "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland,* 466 U.S. at 689,

104 S.Ct. 2052 (citation and quotations omitted).

## B. *Discussion*

### 1. *Background*

The record includes the transcript of the police interview of E.R. (*see* C.T. 210–40). Detective Baker, assisted by Detective Myers, conducted the interview. E.R.'s mother also was present. Detective Baker told E.R. that the detectives were going to show her a group of pictures and said: "I want you to look at all six pictures and just tell me if you recognize anybody." (C.T. 212). E.R. said: "Okay." (C.T. 212). The following occurred:

> Detective Baker: And then if you do, tell me where you recognize them from or what you recognize about them. Okay?
>
> We'll call that card A. Take a look at those faces and it's only their faces, but—you recognize that guy? From where?
>
> [E.R.]: From—I forgot.
>
> Detective Baker: You forgot? Have you seen him around the neighborhood?
>
> [E.R.]: (No audible response.)
>
> Detective Baker: You have? Do you know—what happened the other, like, two weeks ago when you were in the front yard, do you remember that, when the guy on the bike and the stuff happened?
>
> [E.R.]: (No audible response.)
>
> Detective Baker: Do you remember that? Look at—look at all six pictures again and see if you recognize the guy that was on the bike that night in any of those six pictures. That's not where you recognize this guy from, is it?
>
> [E.R.]: (No audible response.)

> Detective Baker: No. Okay. Well, take—how about if you look at Number 2, look at ~~that~~[2] guy, just follow my finger, do you recognize that guy as maybe the guy on the bike?
>
> [E.R.]: No.
>
> Detective Baker: No? How about that guy?
>
> Detective Myers: You're shaking your head up and down. Okay.
>
> Detective Baker: Yes?
>
> [E.R.]: Yes.
>
> Detective Baker: That's the guy that was on the bike that night?
>
> [E.R.]: (No audible response.)
>
> Detective Baker: Okay. And did you see what he did?
>
> [E.R.]: He had a gun (Inaudible)
>
> Detective Baker: They were saying bad words? Now, this guy, No. 3, was he the guy on the bike?
>
> [E.R.]: (No audible response.)
>
> Detective Baker: He was on the bike and then there was something [sic] else, right? Was he in a car?
>
> [E.R.]: Uh-huh.
>
> Detective Baker: And there was just the two of them and they were saying bad words?
>
> [E.R.]: Well, the guy with the bicycle.
>
> Detective Baker: Okay. He was saying bad words, okay, to the guy in the car? And then you said something about a gun? He had a gun?
>
> [E.R.]: Uh-huh.
>
> . . .
>
> Detective Baker: . . . Did you see him shoot the gun?
>
> [E.R.]: He shot the guy.

---

**2.** The record does not contain any explanation for the fact that the word "that" appears to have been stricken.

Detective Baker: He shot the other guy? The guy in the car?

[E.R.]: He hit the guy who was in the back of the car.

Detective Baker: Okay. Do you remember how many times he shot the gun?

[E.R.]: One time

. . .

Detective Myers: How are you feeling?

[E.R.]: Fine.

Detective Myers: Yeah? Is school going okay?

[E.R.]: (No audible response)

Detective Myers: You know, sometimes bad things happen and we don't like them to happen, but when they do we have—our job is to go out and find that bad guy, okay?

And we talk to people like you and other people that help us find that bad guy and then we can catch them and then he can go to jail. Cause that's what bad guys should—that's where they should go, right? Okay. So you did a great job. You did a awesome job. Okay? So I just want you to feel real good about yourself, okay?

Detective Baker: Excellent. . . . I'm sorry to make you look at this again, but just to clear this up since we looked at 1 and 2 and you said they were the guy on the bike [sic], I just want you to look, at this one, Number 4, does he look familiar?

[E.R.]: (No audible response.)

Detective Baker: No? Can you say it out loud for me—

[E.R.]: Huh-uh.

Detective Baker:—instead of shaking your head—no? Okay. And Number 5, does he look familiar?

[E.R.]: No.

Detective Myers: No?

Detective Baker: No? Okay, and Number 6?

[E.R.]: No.

Detective Baker: Okay. Just Number 3. Okay. Do you know what a circle is?

[E.R.]: (No audible response.)

Detective Baker: If I give you the pen, do you think you can circle No. 3?—Awesome, okay.

Detective Myers: Do you know how to write your name?

[E.R.]: (No audible response.)

Detective Myers: Could you write your name right there below that?

[E.R.]: Right here?

Detective Myers: Either there or right below. Either one is fine.

Detective Baker: Wow.

. . .

Detective Myers: [E.], this is very important for us, okay? And like I say, you've done a fantastic job and I'm very proud of you. You should be proud of yourself.

And I just want to make sure this is the person right here is the person you saw on the bicycle that said the bad words. Yes or—yes or no?

[E.R.]: Yes.

. . .

(C.T. 212–20).

E.R. told the detectives that she saw two people in the car, that one of the people got out of the car, and that the back window of the car was broken (C.T. 233–37). Detective Baker asked E.R. if she had seen the shooter before (C.T. 215). E.R. gave no audible response, but Baker said: "No, you hadn't seen him ever before? Have you seen him since that night?" (C.T. 215). E.R. said she had seen the person twice after the incident (C.T. 215). Later, E.R. said she had seen the person before (C.T. 227).

In his motion for a new trial, Petitioner contended that trial counsel was ineffective for failing to object to the admission of E.R.'s pretrial identification (C.T. 197–203). The trial court rejected this contention, saying: "Looking at the overall trial, looking at the area regarding the—that particular child's identification, I cannot say that counsel's performance was so deficit [sic] when measured up against the standard of a reasonable competent attorney." *Id.* Petitioner raised this claim on appeal and in the habeas petition filed in the Court of Appeal (Respondent's Lodgments 3, 6). In support of the claim, Petitioner submitted the declaration of trial counsel (Respondent's Lodgment 6, Ex. 4). Petitioner also relies on this declaration in the present proceeding (*see* Pet. Mem., Ex. B). In the declaration, trial counsel stated that he never moved to suppress the identification because he "did not believe there was sufficient evidence to show police coercion or suggestiveness to the extent that the eyewitness evidence could be the subject of a successful suppression motion" (Respondent's Lodgment 6, Ex. 4, ¶ 8; *see* Pet. Mem., Ex. B, ¶ 8).

The Court of Appeal ruled that the procedure used was not unduly or unnecessarily suggestive (Respondent's Lodgment 7, pp. 6–8; *People v. Oliva*, 2006 WL 3825072, at *4). The Court of Appeal stated that the officer did not cause Petitioner's photograph to stand out from the others in a way that suggested to E.R. that she should select Petitioner's photograph (Respondent's Lodgment 7, p. 7; *People v. Oliva*, 2006 WL 3825072, at *4). The Court of Appeal stated that the officer did not "signal" a choice to E.R. by praising her or by asking her the details of the crime following her identification of Petitioner, and never told E.R. she had made the "'right' choice" (Respondent's Lodgment 7, p. 7; *People v. Oliva*, 2006 WL 3825072, at *4). The Court of Appeal concluded that, because the procedure assertedly was not suggestive, Petitioner's counsel's supposedly "tactical" decision not to bring a motion to suppress was reasonable (Respondent's Lodgment 7, pp. 7–8; *People v. Oliva*, 2006 WL 3825072, at *4).

### 2. *Discussion*

To succeed on his claim that counsel ineffectively failed to make a motion to suppress E.R.'s pretrial identification, Petitioner must show that: (1) counsel's decision not to file the motion was objectively unreasonable; (2) there is a reasonable probability that, had counsel made the motion, the motion would have been granted; and (3) there is a reasonable probability that the jury would have reached a different verdict absent the introduction of the challenged identification. *See Styers v. Schriro*, 547 F.3d 1026, 1029–30 (9th Cir. 2008); *Van Tran v. Lindsey*, 212 F.3d 1143, 1156 (9th Cir.), *cert. denied*, 531 U.S. 944, 121 S.Ct. 340, 148 L.Ed.2d 274 (2000), *abrogated on other grounds, Lockyer v. Andrade*, 538 U.S. 63, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003); *see generally Kimmelman v. Morrison*, 477 U.S. 365, 375, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986).

At the time of Petitioner's trial in 2004, it was well established that evidence derived from a suggestive pretrial identification procedure is inadmissible if the challenged procedure was so "impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *See Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *see also Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *People v. Gordon*, 50 Cal.3d 1223, 1242–43, 270 Cal.Rptr. 451, 792 P.2d 251 (1990), *cert. denied*, 499 U.S. 913, 111 S.Ct. 1123, 113 L.Ed.2d 231 (1991), *overruled on other grounds, People v. Edwards*, 54 Cal.3d 787, 835, 1 Cal.Rptr.2d 696, 819

P.2d 436 (1991), *cert. denied,* 506 U.S. 841, 113 S.Ct. 125, 121 L.Ed.2d 80 (1992). However, the admission of an identification that followed a suggestive identification procedure does not violate due process if the identification is reliable under the totality of the circumstances. *See Manson v. Brathwaite,* 432 U.S. at 111–14, 97 S.Ct. 2243; *United States v. Dring,* 930 F.2d 687, 693 (9th Cir.1991), *cert. denied,* 506 U.S. 836, 113 S.Ct. 110, 121 L.Ed.2d 68 (1992); *People v. Ochoa,* 19 Cal.4th 353, 412, 79 Cal.Rptr.2d 408, 966 P.2d 442 (1998), *cert. denied,* 528 U.S. 862, 120 S.Ct. 152, 145 L.Ed.2d 130 (1999).

■ Here, the identification procedure was so clearly suggestive that the Court of Appeal's contrary decision was objectively unreasonable. The detectives never admonished E.R. that the photographic lineup might or might not contain a photograph of the suspect. Such an admonition is extremely important to avoid suggestiveness in the presentation of a photographic lineup to an adult witness.[3] Such an admonition is even more critical to avoid suggestiveness in the presentation of a photographic lineup to a six-year-old child. Baker claimed he did not admonish E.R. because "she would not understand the mature language" in the standard admonition (*see* Respondent's Lodgment 7, p. 7; *People v. Oliva,* 2006 WL 3825072, at

*4). Yet, neither detective made any attempt to rephrase the standard admonition into simpler language, assuming the language of the standard admonition really was too "mature" for E.R.[4] Neither detective made any attempt to make sure E.R. understood that the photographs she viewed might or might not contain a photograph of the perpetrator. Indeed, E.R. in fact believed that the group of photographs necessarily *did* contain a photograph of the perpetrator. She testified at trial that she thought that one of the photographs must have been that of the perpetrator, and that she thought she "had to make a selection of one of these pictures" (R.T. 527–28). The Court of Appeal never mentioned E.R.'s trial testimony concerning her belief that the photographic lineup contained the perpetrator's photograph and that she had to make a selection.

Detective Baker put together the photo lineup containing Petitioner's booking photograph, and hence knew which photograph was Petitioner's (*see* R.T. 675–76). When Detective Baker first asked E.R. from where she recognized the person in photo number 1, E.R. said: "I forgot." Baker asked her if she had seen that person around the neighborhood, and she apparently answered affirmatively. Baker then asked her if she recognized the per-

---

**3.** *See* Gary L. Wells, "Eyewitness Identification Procedures: Recommendations for Lineups and Photospreads," 22 *Law and Human Behavior* No. 6 (1998) at pp. 11, 23, available at www.psychology.iastate.edu/faculty/gwells/whitepaperpdf.pdf (characterizing such an admonition as "essential," after surveying empirical studies demonstrating that the absence of such an admonition causes witnesses to select the person in the lineup or photo spread who looks most like the perpetrator, even when the perpetrator is not in the lineup or photo spread); *accord* Pat Priest, "Eyewitness Identification and the Scientific Method," 65 Texas B.J. 974 (2002); *see also* California Commission on the Fair Adminis-

tration of Justice, *Final Report* (2008), available at www.ccfa.org/documents/CCFAJFinal Report.pdf (After four-year study, the Commissioners (including the California Attorney General and the Chief of the Los Angeles Police Department) recommended, *inter alia,* that "[a]ll witnesses should be instructed that a suspect may or may not be in a photo spread, lineup or show-up . . .").

**4.** The admonition Detective Baker gave to Cardenas began, rather simply, "In a moment I am going to show you a group of photographs. This group of photographs may or may not contain a picture of the person who committed the crime . . ." (R.T. 666).

son on the bike in any of the six pictures, utilizing the leading question "That's not where you recognize this guy [the person in photograph number 1], is it?" Baker thus suggested to E.R. that the person in photograph number 1 was not the shooter.[5] The Court of Appeal noted this exchange without mentioning the fact that Baker thereby effectively suggested to E.R. that she should eliminate the person in photograph number 1 as the perpetrator.

Furthermore, after E.R. had identified Petitioner's photograph, but *before* Baker asked E.R. about photographs 4, 5 or 6, Detective Myers told E.R. that the officers' job was to find "that bad guy" and put him in jail. Detective Myers praised E.R., saying she had done an "awesome" job. Not surprisingly, after having been praised for doing an awesome job helping the police put "that bad guy" in jail, E.R. failed to identify any of the people in the remaining three photographs as the person on the bicycle; none of them was "that bad guy" she already had done such an "awesome" job identifying. The detectives thus effectively eliminated the persons in photographs 4, 5 and 6 *before* asking E.R. specifically if any of those persons were the person on the bicycle. Detective Baker also praised E.R. for a "fantastic job" before asking her again whether the person she had identified was the person on the bicycle. Such a young child easily could have decided she should complete her "awesome" and "fantastic" job by reaffirming that Petitioner was the person on the bicycle.

The Court of Appeal concluded that the interviewing officer did not "signal" a choice to E.R. and did not praise her for making the "right" choice. These conclusions unreasonably fly in the face of the undisputed evidence of record. As indicat-

ed above, the detectives *did* signal to E.R. that the persons in photographs 1, 4, 5 and 6 were not the perpetrator. Moreover, immediately after E.R. chose Petitioner's photograph, and before she was asked about the remaining photographs, E.R. was told she "*did*" (in the past tense) a "great" and "awesome" job and should feel "real good" about herself. In such circumstances, any person, much less a child of six, easily could have understood she was being told she had made the "right" choice.

To prove a *Strickland* violation, Petitioner must show a reasonable probability that, had counsel made the motion, the motion would have been granted. *See Styers v. Schriro,* 547 F.3d at 1029–30. A motion to suppress an identification made during a suggestive procedure will be denied when the identification nevertheless was "reliable." *Id.* Because the Court of Appeal unreasonably determined that the identification procedure was not suggestive, the Court of Appeal never reached the reliability prong of the analysis.

■■■■ Had counsel filed a motion to suppress, and had the state court correctly determined that the identification procedure was suggestive, the court would have confronted the reliability issue. The "central question" is "whether under the 'totality of the circumstances' the identification is reliable even though the confrontation procedure was suggestive." *Neil v. Biggers,* 409 U.S. at 199, 93 S.Ct. 375. The factors to be considered in evaluating the reliability of an identification after a suggestive procedure include:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty dem-

---

**5.** It was of course possible that E.R. could recognize a person in one of the photographs both as someone she had seen previously in

the neighborhood and also as the person on the bicycle.

onstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Neil v. Biggers,* 409 U.S. at 199–200, 93 S.Ct. 375; *see also People v. Gordon,* 50 Cal.3d at 1242–43, 270 Cal.Rptr. 451, 792 P.2d 251 (citation omitted). Where the reliability of an identification by a child witness is at issue, a court also should consider the child's age. *See, e.g., Haliym v. Mitchell,* 492 F.3d 680, 706–07 (6th Cir. 2007) (seven year old age of witness "counsels against a finding of reliability. Studies show that children are more likely to make mistaken identifications than are adults") (citations and quotations omitted); *Bryant v. Commonwealth,* 10 Va.App. 421, 425, 393 S.E.2d 216 (1990) ("The witness' youthfulness is obviously a factor to be considered under the [*Manson v.*] *Brathwaite* totality of circumstances test.").

Here, the witness' opportunity to view the criminal was fleeting.[6] E.R. testified she saw the incident from a distance of approximately fifteen feet, but she also testified she did not watch the boy on the bicycle and the car during the entire incident (R.T. 496). E.R. testified that the shooter's back was toward E.R. when he was yelling at the person in the car, but claimed that she saw his face when he fired the shot (R.T. 496, 499, 500). She also said that the shooter was not facing her when he bicycled away, although she claimed she saw his face as he rode away (R.T. 500). During the brief incident, E.R. also reportedly focused her attention on the broken car window and the gun, which she said she saw fired only once (C.T. 215). Thus, it appears E.R. had only a very limited opportunity to view the perpetrator's face. The factors of the witness'

opportunity to view the criminal and the witness' degree of attention do not weigh in favor a finding of reliability.

With respect to the accuracy of a prior description, the record does not contain any direct evidence regarding Petitioner's appearance or attire on the day of the incident. Consequently, the only comparisons available are comparisons between E.R.'s description and other witnesses' descriptions of the person on the bicycle. E.R. testified that, on the night of the shooting, she told police that the person on the bicycle was bald, had a shaved head, and no facial hair (R.T. 514–15). This description was fairly consistent with the description by Cardenas (*see* R.T. 582–83, 585). However, the description apparently fit a number of people Cardenas saw that day in that place. Cardenas said all the young men she saw riding bikes were young male Hispanics wearing shorts (R.T. 582, 599). Also, at the time of Cardenas' pretrial identification of Petitioner's photograph, Cardenas told police, "To me like as soon as everybody started getting together, and they were like a whole bunch of people looked [sic] like him," and said she hoped she was not "making the wrong" (R.T. 702–03). E.R. also said she told police that the person was wearing a dark jacket or sweatshirt with a hood, but at trial E.R. said there was no hood (R.T. 511, 515). A.R. told police the shooter wore a dark-colored hooded sweatshirt (R.T. 706). Cardenas said the person wore a dark jersey-type shirt and did not wear a jacket or hooded sweatshirt (R.T. 577–78). Because the record contains no direct evidence of Petitioner's actual appearance on the day of the incident, because E.R.'s

---

**6.** Maria Cardenas testified that she watched the person on the bicycle for "maybe ten seconds at the most" as he circled around in the intersection (R.T. 554–55). After Cardenas finished buckling her children into the car, she looked up and saw that the other bicyclists had disappeared, and the person she had seen circling in the intersection was still yelling (R.T. 576). The person on the bicycle disappeared, and Cardenas heard a shot approximately five seconds later (R.T. 558, 576).

prior description fit a number of other people at the scene, and because she gave inconsistent descriptions of the shooter's attire, this factor does not weigh in favor a finding of reliability.

E.R.'s identification occurred approximately two weeks after the shooting, a relatively short length of time. *See United States v. Barrett*, 703 F.2d 1076, 1085 (9th Cir.1983). This factor militates in favor of reliability.

With respect to E.R.'s level of certainty, as indicated above, E.R. expressed certainty at trial that the person she had identified in the interview was the person on the bicycle, and Detective Baker testified that E.R. did not "waver" in her identification of Petitioner's photograph during the pretrial interview. However, E.R. testified that, when she was shown the photo lineup and asked whether she recognized anyone, she started looking at all of the pictures and then pointed to photograph number 1 "because he looked like his [*i.e.*, the perpetrator's] face,"[7] but later changed her selection to photograph number 3 (R.T. 522, 526, 528–29). Moreover, E.R.'s expressions of confidence in her pretrial identification prove little concerning the reliability of the identification, given the patent suggestiveness of the identification procedure, including the detective's leading question preceding E.R.'s withdrawal of her selection of photograph number 1 and the detectives' praise for E.R.'s performance following her identification of photograph number 3. Additionally, at trial E.R. could not identify anyone in the courtroom as the perpetrator (R.T. 492–93).[8] In fact, at trial E.R. said she was sure she did *not* see the person on the bicycle in the courtroom (R.T. 493). Consideration of all of these circumstances casts grave doubt on the reliability of E.R.'s expressions of certainty in her identification, and militates strongly in favor of the conclusion that her identification was not reliable.

Based on the factors discussed above, a reasonable and objective evaluation of the "totality of the circumstances" would conclude that E.R.'s identification was not reliable. Therefore, had Petitioner's counsel made a motion to suppress, it is reasonably probable that the trial court, faithfully applying the principles set forth in Supreme Court case law, would have concluded not only that the identification procedure was suggestive but also that E.R.'s identification was not sufficiently reliable to warrant its introduction at trial.

Accordingly, the Court of Appeal's ruling that Petitioner's counsel made a reasonable "tactical" decision not to bring a motion to suppress was an objectively unreasonable ruling. Counsel's supposedly "tactical" decision rested on counsel's alleged belief that the identification procedure used was not sufficiently suggestive.[9] Given the patent suggestiveness of the procedure used, and the unreliability of the identification, counsel's alleged belief (and counsel's inaction assertedly predicated thereon) fell below any objective standard of reasonableness.

The final issue in the ineffectiveness analysis is whether the failure to suppress E.R.'s identification prejudiced Petitioner, *i.e.*, whether there would have been a reasonable probability of a different result at

---

7. Thus, E.R.'s initial selection of photograph 1 was, in E.R.'s mind, an initial identification of the perpetrator, rather than merely an identification of someone E.R. had seen before.

8. Although at trial Petitioner was thinner and had longer hair and a mustache, all of the persons in the photo lineup containing Petitioner's photographs had mustaches (R.T. 589).

9. Petitioner's counsel admitted he believed that E.R.'s identification of Petitioner was "unreliable" (Respondent's Lodgment 6, Ex. 4, ¶ 7; *see* Pet. Mem., Ex. B, ¶ 7).

trial had counsel made the motion to suppress and had the court granted the motion.[10] In the absence of E.R.'s statements, the prosecution's case would have rested almost entirely on the pretrial and in-court identifications of Maria Cardenas. Although the prosecution introduced evidence that Petitioner had access to Tiznado's bicycles, the evidence showed that other people also had access to Tiznado's bicycles. Other evidence, such as testimony that Petitioner was in the neighborhood on the day of the incident, that Petitioner initially gave a false name when arrested, that other witnesses may have lied, or that Petitioner had several girlfriends and frequented an area which the victim also visited, had scant incriminating, probative value. The trial court aptly commented that "this case kind of rises and falls with the eyewitness' identification" (R.T. 722).

Thus, in the absence of E.R.'s identification, the prosecution's case essentially would have stood or fallen based on the strength of Cardenas' identifications of Petitioner. Cardenas' identifications of Petitioner were not strong. Cardenas did not confidently identify Petitioner in court. Rather, she displayed a notable lack of certainty. Asked whether the person riding the bicycle in the middle of the intersection was in court, Cardenas said: "I think so" (R.T. 560). When the court then asked whether there was anyone in court whom Cardenas believed was that individual, Cardenas said: "I don't know" (R.T. 560). Thereafter, when the prosecutor asked Cardenas whether there was someone in court whom Cardenas "thought" was the person on the bicycle, Cardenas identified Petitioner (R.T. 560).

Cardenas testified on direct examination that she got a "good look" at the person on

the bicycle (R.T. 576). However, on cross-examination Cardenas said she was telling the truth at the preliminary hearing when she testified that she did *not* get a "good look" at that person, and when she testified: "It just looked a little bit too far to be concentrated on the face and I am nearsighted" (R.T. 580). Petitioner's counsel asked Cardenas: "You simply cannot say with any certainty that he [Petitioner] is the person that you saw on the bike, can you?" (R.T. 592). Cardenas replied: "I don't know because he's thin. He's setting down right now and his hair is different. The shape of his face is different. And—I don't know." (R.T. 593).

With respect to the pretrial identification, Cardenas testified that, when she viewed the photo lineup, she narrowed her choice to two pictures, but finally chose Petitioner's because he "look[ed] like" the person on the bicycle (R.T. 567, 589). Cardenas admitted that she told the detectives that she was not certain about her identification of Petitioner's photograph, and told them that she did not get a good look at the person's face (R.T. 588–89, 591).

The record suggests that, even with the evidence of E.R.'s pretrial identification, the jury struggled with the central issue of identification. The jury deliberated for approximately two and a half days before reaching a verdict (C.T. 120–21, 125–27, 182–83). On the first full day of deliberations, the jury sent the court three notes, two of which requested readbacks of: (1) "Maria Cardenas' testimony re: description of the guy she saw circling on the bike and her identification on Oct. 18 from the six-pack"; and (2) "[E.R.]'s testimony re: description of the 'boy on the bike' and identification on Oct 18 from the six pack" (C.T. 123–24).[11] The readbacks occurred

---

**10.** Of course, the Court of Appeal never reached this issue.

**11.** The third note requested a readback of Detective Baker's testimony regarding his in-

terview with Galaviz concerning how Baker came to look for the car identified at trial as Petitioner's (C.T. 122).

the next afternoon, but the jury still did not reach a verdict until late the following morning (C.T. 182–83). The length of the deliberations and the jury's requests for readbacks of Cardenas' and E.R.'s testimony concerning their identifications strongly suggest that the jury had some difficulty with the identification evidence.

Considering Cardenas' expressed lack of certainty in her in-court and pretrial identifications of Petitioner, and considering the jury's evident struggle to reach a verdict even with the evidence of E.R.'s identification, it is reasonably probable that, without E.R.'s identification, the trial would have yielded a different outcome. Therefore, Petitioner is entitled to habeas relief on this claim.[12]

## II. *The Evidence Was Sufficient to Support Petitioner's Conviction.*

### A. *Legal Standards*

▄▄▄ Although Petitioner is entitled to habeas relief on his claim that trial counsel ineffectively failed to move to suppress E.R.'s identification, the Court nevertheless must evaluate the sufficiency of the trial evidence, "as the Double Jeopardy Clause would preclude retrial if the evidence were insufficient." *See Bean v. Calderon,* 163 F.3d 1073, 1086 (9th Cir.1998), *cert. denied,* 528 U.S. 922, 120 S.Ct. 285, 145 L.Ed.2d 239 (1999) (citation omitted). "The double jeopardy clause does not bar retrial after a reversal based on the erroneous admission of evidence if the evidence erroneously admitted supported the conviction." *United States v. Chu Kong Yin,* 935 F.2d 990, 1001 (9th Cir.1991). Thus, even if a court determines that the evidence is insufficient to support a conviction without the improperly admitted evidence, if the evidence is sufficient when the improperly admitted evidence is considered,

the Double Jeopardy Clause allows retrial. *See Lockhart v. Nelson,* 488 U.S. 33, 40–42, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988). "[A] reviewing court must consider all of the evidence admitted by the trial court in deciding whether retrial is permissible under the Double Jeopardy Clause...." *Lockhart v. Nelson,* 488 U.S. at 41, 109 S.Ct. 285.

▄▄▄ On habeas corpus, the Court's inquiry into the sufficiency of evidence is limited. Evidence is sufficient unless the charge was "so totally devoid of evidentiary support as to render [Petitioner's] conviction unconstitutional under the Due Process Clause of the Fourteenth Amendment." *Fish v. Cardwell,* 523 F.2d 976, 978 (9th Cir.1975), *cert. denied,* 423 U.S. 1062, 96 S.Ct. 801, 46 L.Ed.2d 654 (1976) (citations and quotations omitted). The evidence is to be considered "in the light most favorable to the prosecution." *Wright v. West,* 505 U.S. 277, 296, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992) (plurality opinion) (*quoting Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). A conviction cannot be disturbed unless the Court determines that no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Wright v. West,* 505 U.S. at 284, 112 S.Ct. 2482; *Jackson v. Virginia,* 443 U.S. at 317, 99 S.Ct. 2781.

▄▄▄ A reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson v. Virginia,* 443 U.S. at 326, 99 S.Ct. 2781. "The reviewing court must respect

---

12. In light of this conclusion, the Court need not, and does not, determine the merits of Petitioner's claim that counsel ineffectively failed to call an eyewitness identification expert.

the exclusive province of the fact finder to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts." *United States v. Hubbard,* 96 F.3d 1223, 1226 (9th Cir.1996); *see also Jones v. Wood,* 114 F.3d 1002, 1008 (9th Cir.1997). "[T]he prosecution need not affirmatively rule out every hypothesis except that of guilt." *Wright v. West,* 505 U.S. at 296, 112 S.Ct. 2482. This Court cannot grant habeas relief on Petitioner's challenge to the sufficiency of the evidence unless the state court's decision constituted an "unreasonable application of" *Jackson v. Virginia. See Juan H. v. Allen,* 408 F.3d 1262, 1274–75 (9th Cir.2005), *cert. denied,* 546 U.S. 1137, 126 S.Ct. 1142, 163 L.Ed.2d 1000 (2006).

## B. *Discussion*

Petitioner contends the evidence was insufficient to show Petitioner was the shooter. Petitioner raised this contention in a motion for a new trial filed in the Superior Court (C.T. 193–240). The Superior Court denied the motion, deeming the evidence sufficient (R.T. 880–81). The Court of Appeal agreed. The Court of Appeal identified the "proper test for determining a claim of insufficiency" as "whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt" (Respondent's Lodgment 7, pp. 2–3; *see People v. Oliva,* 2006 WL 3825072, at *1). This formulation comports with the *Jackson v. Virginia* standard.[13] The Court of Appeal ruled that Petitioner's arguments went to the weight of the evidence, not its sufficiency, and that Petitioner had not shown physical impossibility or inherent improbability (Respondent's Lodgment 7, p. 5; *see People v. Oliva,* 2006 WL 3825072, at *1–3). The

Court of Appeal concluded that a "reasonable jury" could have found Petitioner guilty beyond a reasonable doubt (Respondent's Lodgment 7, p. 5; *see People v. Oliva,* 2006 WL 3825072, at *1–3).

Reasoning in the recent decision of *Brown v. Farwell,* 2008 WL 2789254 (9th Cir. July 21, 2008), *pet. for cert. filed* (Oct. 24, 2008) (No. 08–559) points out a flaw in the Court of Appeal's decision in the present case. In *Brown v. Farwell,* the Ninth Circuit held that the Nevada Supreme Court's decision upholding the sufficiency of the evidence was "contrary to" *Jackson v. Virginia.* The Ninth Circuit so concluded because, among other things, the Nevada Supreme Court's articulated standard for determining evidentiary sufficiency required a determination whether a "reasonable" jury could have found the defendant's guilt beyond a reasonable doubt, rather than whether a "rational" jury could have done so. In Petitioner's case, the Court of Appeal initially articulated the correct "rational" juror standard, but concluded its discussion by stating that a "reasonable" jury could have found Petitioner guilty beyond a reasonable doubt. According to *Brown v. Farwell,* application of the latter standard would have been "contrary to" *Jackson v. Virginia.* Where a state court applies an incorrect legal standard, a federal habeas court's review is *de novo. See Frantz v. Hazey,* 533 F.3d 724, 735 (9th Cir.2008) (en banc) ("we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised"); *Delgadillo v. Woodford,* 527 F.3d at 925.

---

**13.** In support of this standard, the Court of Appeal cited a state case, *People v. Jones,* 51 Cal.3d 294, 314, 270 Cal.Rptr. 611, 792 P.2d 643 (1990). *People v. Jones* cites *People v.* *Barnes,* 42 Cal.3d 284, 303, 228 Cal.Rptr. 228, 721 P.2d 110 (1986), which in turn cites, *inter alia, Jackson v. Virginia.*

In the present case, it is unclear which of the two articulated standards ("rational" or "reasonable") the Court of Appeal actually applied. However, this Court need not determine which standard the Court of Appeal applied. Regardless of whether this Court utilizes a *de novo* standard of review or the more deferential AEDPA standard, the Court concludes that the evidence was constitutionally sufficient to support Petitioner's conviction.

A rational trier of fact could have concluded from the testimony of Cardenas and E.R.[14] that Petitioner was the shooter. Although, as discussed above, Maria Cardenas' identifications were not strong, Cardenas did testify that Petitioner looked like the person she saw on the bicycle, and Detective Baker testified that Cardenas told detectives that her level of certainty with respect to her pretrial identification was 8 to 9 on a scale of 1 to 10. E.R. could not identify Petitioner at trial, but she testified that she had seen Petitioner before the shooting, that she had identified Petitioner's photograph as that of the person on the bicycle, and that she was sure it was he.[15] "Identification of the defendant by a single eyewitness may be sufficient to prove the defendant's identity as the perpetrator of a crime." *People v. Boyer*, 38 Cal.4th 412, 480, 42 Cal.Rptr.3d 677, 133 P.3d 581 (2006), *cert. denied*, 549 U.S. 1021, 127 S.Ct. 556, 166 L.Ed.2d 413 (2006) (citation omitted); *see also United States v. McClendon*, 782 F.2d 785, 790 (9th Cir. 1986) (testimony of one eyewitness, even where inconsistent with other evidence, suffices to support a conviction). "Moreover, a testifying witness's out-of-court identification is probative for that purpose and can, by itself, be sufficient evidence of the defendant's guilt even if the witness does not confirm it in court." *People v. Boyer*, 38 Cal.4th at 480, 42 Cal.Rptr.3d 677, 133 P.3d 581 (citation omitted). "[T]estimony that a defendant resembles the [perpetrator] [citations], or looks like the same [citations], has been held sufficient." *People v. Jackson*, 183 Cal.App.2d 562, 568, 6 Cal.Rptr. 884 (1960); *see also People v. Cooks*, 141 Cal.App.3d 224, 278, 190 Cal.Rptr. 211 (1983), *cert. denied*, 464 U.S. 1046, 104 S.Ct. 718, 79 L.Ed.2d 180 (1984) (testimony of single eyewitness who was "90 percent sure" of his identification sufficient); *United States v. Smith*, 563 F.2d 1361, 1363 (9th Cir.1977), *cert. denied*, 434 U.S. 1021, 98 S.Ct. 747, 54 L.Ed.2d 769 (1978) (statement that defendant "look[ed] like" the perpetrator sufficient).

Although Petitioner points to alleged discrepancies in the witnesses' testimony, it was the province of the jury to credit the evidence showing that Petitioner was the shooter. *See United States v. Ginn*, 87 F.3d 367, 369 (9th Cir.1996) ("The evidence is not rendered insufficient simply because there are discrepancies in the eyewitnesses' descriptions of the robber."); *see also Gibbs v. Kemna*, 192 F.3d 1173, 1175–76 (8th Cir.1999), *cert. denied*, 531 U.S. 846, 121 S.Ct. 116, 148 L.Ed.2d 72 (2000) (rejecting challenge to sufficiency of evidence based on alleged unreliability of witness identifications; petitioner's arguments went to witnesses' credibility, not the sufficiency of the evidence, and "credibility is for the jury to decide") (citation omitted); *United States v. Brewer*, 36 F.3d 266, 269–70 (2d Cir.1994) (witnesses' state-

14. In the sufficiency analysis, the reviewing court must consider all of the evidence admitted by the trial court, even evidence admitted erroneously. *See Lockhart v. Nelson*, 488 U.S. at 41–42, 109 S.Ct. 285.

15. *Compare Brown v. Farwell*, 525 F.3d 787, 797 (9th Cir.2008) (evidence insufficient where, among other things, child witness identified petitioner as her attacker, but also twice identified petitioner's brother as the assailant).

ments that defendant "resembled" or "looked like" one of the robbers did not render evidence insufficient); *People v. Jackson,* 183 Cal.App.2d at 568, 6 Cal. Rptr. 884 ("The uncertainty of recollection, qualification of identity and lack of positiveness in the testimony of the several witnesses complained of by appellant were matters going to the weight of the evidence and the credibility of witnesses [citations], and for the observation and consideration, and directed solely to the attention of, the jury in the first instance...."). A jury's credibility determinations are "entitled to near-total deference under *Jackson* [*v. Virginia*]." *Bruce v. Terhune,* 376 F.3d 950, 957–58 (9th Cir.2004) (citations omitted) (evidence sufficient to show petitioner molested his 10–year–old cousin; federal habeas court could not revisit jury's resolution of inconsistencies between victim's account and those of other witnesses, and victim's account was not "wholly incredible"); *see also United States v. Franklin,* 321 F.3d 1231, 1239–40 (9th Cir.), *cert. denied,* 540 U.S. 858, 124 S.Ct. 161, 157 L.Ed.2d 106 (2003) (in reviewing the sufficiency of the evidence, a court does not "question a jury's assessment of witnesses' credibility" but rather presumes that the jury resolved conflicting inferences in favor of the prosecution). The issue whether witnesses lied or erred in their perceptions or recollections is properly left to the jury. *United States v. Zuno–Arce,* 44 F.3d 1420, 1423–24 (9th Cir.), *cert. denied,* 516 U.S. 945, 116 S.Ct. 383, 133 L.Ed.2d 306 (1995).

Upon this Court's review of the entire record,[16] the Court concludes that the evidence was constitutionally sufficient. Therefore, Petitioner is not entitled to habeas relief on his challenge to the sufficiency of the evidence.

---

**16.** The Court must conduct an independent review of the record when a habeas petitioner

challenges the sufficiency of the evidence. *See Jones v. Wood,* 114 F.3d at 1008.

## RECOMMENDATION

For the foregoing reasons, IT IS RECOMMENDED that the Court issue an Order: (1) approving and adopting this Report and Recommendation; and (2) directing that Judgment be entered conditionally granting habeas relief.

DATED: November 12, 2008.